JOHN W. HUBER, United States Attorney (#7226)
SANDRA L. STEINVOORT, Assistant United States Attorney (#5352)
JOEL A. FERRE, Assistant United States Attorney (#7517)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite #1800
Salt Lake City, Utah 84111-2176
Telephone: (801) 524-5682
Email: sandra.steinvoort@usdoj.gov

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* REGINALD WILLIAMS, <br><br> Plaintiff, <br><br> v. <br><br> ROBYN WILLIAMS, RONALD GORDON, RICHARD ZIEBARTH, KIRK TORGENSEN, THOMAS PATTERSON, LONDON STROMBERG, MIKE RAPICH, DAN MALDONADO, DANIEL BECKER, RHETT MCQUISTON, TOM DARAIS, JEFFREY WILSON, MIKE HADDON, KIM ALLARD, DANIEL CHESTNUT, LEO LUCY, RICH TOWNSEND, GERI MILLER, and the STATE OF UTAH, <br><br> Defendants. | Case No. 2:15–cv–00054–RJS–DBP <br><br> **UNITED STATES' COMPLAINT IN INTERVENTION** <br><br> District Judge Robert J. Shelby <br><br> Magistrate Judge Dustin B. Pead |

---

## NATURE OF THE ACTION

1.      This is a civil grant fraud action.

2.      Defendants applied for and received four grants from and entered into three

cooperative agreements with the United States Department of Justice ("DOJ").

3.      As applicants for and recipients of federal money, the Defendants were required to expressly certify that they would and did use this money in accordance with federal grant program requirements.

4.      Instead of properly using the grant money they received, Defendants misused it by replacing rather than supplementing state money. In particular, Defendants used federal money to pay salaries of existing State employees and then did not, when required, immediately fill the vacated positions. This amounted to Defendants supplanting rather than supplementing their agency budgets in contravention of the grant requirements and certifications Defendants made to DOJ.

5.      Because of Defendants' false certifications, the United States awarded the State and its agencies millions of dollars in grant money made available by the United States Department of Justice's Edward Byrne Memorial Justice Assistance Grant ("JAG") Program, the JAG - American Recovery Reinvestment Act ("ARRA") Program, and the Internet Crimes Against Children ("ICAC") Task Force Continuation Program.

6.      Defendants knowingly submitted or caused to be submitted false claims for payment to the United States in violation of the False Claims Act, 31 U.S.C. § 3729(a). Such actions also violate common law and equitable theories of payment by mistake, unjust enrichment, recoupment, conversion, breach of contract, and breach of the contract covenant of good faith and fair dealing.

## JURISDICTION AND VENUE

7.      The United States brings this action under the False Claims Act and under common law and equitable theories of payment by mistake, unjust enrichment, recoupment,

conversion, breach of contract, and breach of the contract covenant of good faith and fair dealing. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345, 1367(a) and 31 U.S.C. § 3730(a).

8.      The Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331, 1345, and 1367 because Defendants reside, can be found, and transact business in the District of Utah, and because they committed acts in this district that violated 31 U.S.C. § 3729.

9.      Venue under 28 U.S.C. § 1391(b) is proper because Defendants reside, can be found, and transact business in the District of Utah, and because a substantial part of the acts giving rise to the United States' claims occurred in the District of Utah.

<u>PARTIES</u>

10.     The United States is the plaintiff. The Department of Justice ("DOJ") is an agency of the United States. DOJ, through its Office of Justice Programs ("OJP"), administers the JAG, JAG – ARRA, and ICAC Task Force Continuation programs.

11.     Relator Reginald Williams ("Relator") is an individual and inmate of the Utah Department of Corrections residing in the Gunnison Correction Facility in Gunnison, Utah. Relator initiated this action on or about January 1, 2015, by filing a Complaint pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b)(1). The United States has intervened and assumed control of Relator's action under 31 U.S.C. § 3730(b)(4), and files this superseding Complaint in Intervention.

12.     Defendant Ronald Gordon is an employee of the State of Utah and was the executive director of the Utah Commission on Criminal and Juvenile Justice ("CCJJ"). He signed

grant applications CCJJ submitted to DOJ. By doing so he attested to the truth and accuracy of the applications and agreed for himself and CCJJ to comply with the grants' requirements. He also had signing authority for the subgrant awards CCJJ made to numerous Utah state agencies. As Executive Director he was responsible for CCJJ's compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

13.     Defendant Richard Ziebarth is an employee of the State of Utah and is the Grant Manager for CCJJ. He prepared and drafted the grant applications CCJJ submitted to the DOJ. He is responsible for submitting and causing others to submit false claims to the United States.

14.     Defendant Kirk Torgensen was an employee of the State of Utah and was the Criminal Chief Deputy of the Office of the Attorney General. He signed grant applications the Office of the Attorney General submitted to CCJJ and DOJ. By doing so, he attested to the truth and accuracy of the applications and agreed for himself and the Utah Attorney General's Office to comply with the grants' requirements. The Utah Attorney General's Office also designated him as the authorized official for one of the ICAC program cooperative agreements. As Criminal Chief Deputy, he was responsible for the Office of the Attorney General's compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

15.     Defendant Thomas Patterson was an employee of the State of Utah and was the Executive Director of the Department of Corrections ("Corrections"). He signed one of the grant applications Corrections submitted to CCJJ. By doing so, he attested to the truth and accuracy of the application and agreed for himself and Corrections to comply with the grant's requirements.

4

As Executive Director he was responsible for Corrections' compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

16.     Defendant Robyn Williams was an employee of the State of Utah and was a Deputy Director of the Department of Corrections. She signed two of the grant applications Corrections submitted to CCJJ. By doing so, she attested to the truth and accuracy of the applications and agreed for herself and Corrections to comply with the grants' requirements.

17.     Defendant London Stromberg is an employee of the State of Utah and was the Deputy Executive Director of the Department of Corrections. He signed one of the grant applications that Corrections submitted to CCJJ. By doing so, he attested to the truth and accuracy of the application and agreed for himself and Corrections to comply with the grant's requirements.

18.     Defendant Mike Rapich is an employee of the State of Utah and Executive Director of the Department of Public Safety ("Public Safety").  He signed grant applications Public Safety submitted to CCJJ. He signed supplanting certifications submitted to CCJJ. By doing so, he attested to the truth and accuracy of the applications and agreed for himself and Public Safety to comply with the grants' requirements. As Executive Director he was responsible for Public Safety's compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

19.     Defendant Dan Maldonado is an employee of the State of Utah and Executive Director of the Division of Juvenile Justice Services ("Division"). He signed grant applications the Division submitted to CCJJ. By doing so, he attested to the truth and accuracy of the applications and agreed for himself and the Division to comply with the grants' requirements. As

Executive Director he was responsible for the Division's compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

20.     Defendant Daniel Becker was an employee of the State of Utah and was State Court Administrator. He signed grant applications the Administrative Office submitted to CCJJ. By doing so, he attested to the truth and accuracy of the applications and agreed for himself and the Administrative Office to comply with the grants' requirements. As Administrator he was responsible for the Administrative Office's compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

21.     Defendant Rhett McQuiston, is an employee of the State of Utah and was a Supervisory Special Agent for Internet Crimes Against Children ("ICAC") Task Force. He signed supplanting certifications submitted to CCJJ. By doing so, he attested to the truth and accuracy of the applications and agreed for himself and the Office of the Utah Attorney General to comply with the grants' requirements. As Supervisory Agent, he was responsible for the ICAC Task Force's compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

22.     Defendant Tom Darais, is an employee of the State of Utah and was a Financial Manager for the Division of Juvenile and Justice Services ("Division"). He signed supplanting certifications submitted to CCJJ. By doing so, he attested to the truth and accuracy of the applications and agreed for himself and the Division to comply with the grants' requirements. As Financial Manager he was responsible for the Division's compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

23.     Defendant Jeffrey Wilson, is an employee of the State of Utah and was a Correction Captain for the Department of Corrections ("Corrections"). He signed grant applications Corrections submitted to CCJJ. By doing so, he attested to the truth and accuracy of the applications and agreed for himself and Corrections to comply with the grants' requirements. As Correction Captain, he was responsible for Corrections' compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

24.     Defendant Mike Haddon, is an employee of the State of Utah and was Deputy Director and is Executive Director of the Department of Corrections ("Corrections"). He signed grant applications Corrections submitted to CCJJ and DOJ. By doing so, he attested to the truth and accuracy of the applications and agreed for himself and Corrections to comply with the grants' requirements. As Executive Director, he was responsible for Corrections' compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

25.     Defendant Daniel Chestnut, is an employee of the State of Utah and was a Program Manager at the Utah Department of Corrections ("Corrections"). He signed supplanting certifications submitted to CCJJ. By doing so, he attested to the truth and accuracy of the applications and agreed for himself and Corrections to comply with the grants' requirements. As a Program Manager, he was responsible for Corrections' compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

26.     Defendant Kim Allard, is an employee of the State of Utah and of the Administrative Office of the Courts ("Courts"). She signed grant applications Courts submitted to CCJJ and DOJ. She signed supplanting certifications submitted to CCJJ. By doing so, she

attested to the truth and accuracy of the applications and agreed for herself and Courts to comply with the grants' requirements. She was responsible for Courts' compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

27.     Defendant Leo Lucy, is an employee of the State of Utah and employee of the Office of the Attorney General ("Attorney General"). He signed grant applications Corrections submitted to CCJJ and DOJ. By doing so, he attested to the truth and accuracy of the applications and agreed for himself and the Attorney General to comply with the grants' requirements. He was responsible for the Attorney General's compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

28.     Defendant Rich Townsend was an employee of the State of Utah and the Department of Public Safety ("Public Safety"). He signed grant applications Public Safety submitted to CCJJ and DOJ. By doing so, he attested to the truth and accuracy of the applications and agreed for himself and Public Safety to comply with the grants' requirements. He was responsible for Public Safety's compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

29.     Defendant Geri Miller, is an employee of the State of Utah and Department of Corrections ("Corrections"). She signed grant applications Corrections submitted to CCJJ and DOJ. By doing so, she attested to the truth and accuracy of the applications and agreed for herself and Corrections to comply with the grants' requirements. She was responsible for Corrections' compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

30.     Defendant State of Utah is a governmental entity with its capitol located in Salt Lake City, Utah. The State through its agencies and employees misused millions of dollars of grant money received from DOJ. It is responsible for submitting and causing others to submit false claims to the United States.

31.     The individual defendants are sued in their individual and official capacities for actions they took as alleged herein.

## THE FALSE CLAIMS ACT

32.     The False Claims Act prohibits the submission of false claims, statements, and records to the United States for payment.

33.     The statute provides, in pertinent part, that any person who: "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or] (C) conspires to commit a violation of [the statute,] . . . ; is liable to the United States Government for a civil penalty . . . plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1)(A)-(C).

34.     The False Claims Act defines the terms "knowing" and "knowingly" as follows:

(1) the terms "knowing" and "knowingly"

(A) mean that a person, with respect to information(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information;

9

(B) require no proof of specific intent to defraud;

31 U.S.C. § 3729(b)(1).

35.     The False Claims Act defines the term "claim" as:

> any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(b)(2).

36.     A request for grant payments submitted to DOJ is a claim under the False Claims Act.

## JAG-ARRA GRANT PROGRAM

37.      Starting in 2009, the United States, through DOJ's Office of Justice Programs, made grant money available through the JAG-ARRA program to state and local law enforcement to preserve and create critical law enforcement jobs. *See* Pub. L. 111-5, § 2, 123 Stat. 130.

38.     The JAG-ARRA program requires as a condition of receiving federal funds that grant recipients comply with several requirements and restrictions on the use of federal grant money. Those requirements and restrictions serve the program' primary objective of restoring and creating jobs.

39.     Replacing state money with federal grant money, a practice known as supplanting, is a key restriction found in many federal grants. It is one of the central restrictions DOJ places on the use of federal grant money awarded through JAG-ARRA grants.

<u>EDWARD BYRNE MEMORIAL JUSTICE ASSISTANCE GRANT PROGRAM</u>

34.     The Edward Byrne Memorial Justice Assistance Grant Program, 42 U.S.C. § 3751, is the primary provider of federal criminal justice funding to state and local jurisdictions.

35.     Like the JAG-ARRA program, the Byrne Memorial JAG program requires, as a condition of receiving federal funds, grant recipients comply with several requirements and restrictions on the use of federal grant money. Those requirements and restrictions serve the program's primary goal of improving the efficiency and effectiveness of criminal justice systems.

36.     Byrne Memorial JAG grants also contain non-supplanting provisions. *See*  42 U.S.C. § 3752(1).

<u>INTERNET CRIMES AGAINST CHILDREN TASK FORCE PROGRAM</u>

37.     The Internet Crimes Against Children Task Force ("ICAC") program helps state and local law enforcement agencies develop an effective response to technology-facilitated child sexual exploitation and Internet crimes against children.

38.     DOJ's Office of Justice Programs originally created the ICAC program under the authority of the 1998 Justice Appropriations Act, Pub. L. 105–119. The Providing Resources, Officers, and Technology to Eradicate Cyber Threats to Our Children Act of 2008, (Pub. L. 110-401, codified at 42 U.S.C. § 17601, et seq.), reauthorized the ICAC program and funding. The

ICAC program is a national network of 61 coordinated task forces representing over 4,500 federal, state, and local law enforcement and prosecutorial agencies.

39.     Unlike the JAG-ARRA and Byrne Memorial JAG programs, the ICAC Task Force Program is not a competitive grant program. DOJ annually invites law enforcement entities to apply for funding through DOJ's Office of Juvenile Justice and Delinquency Prevention. DOJ sends a letter of invitation directly to an entity which details the amount of money that the entity can receive. The ICAC program documents reference and incorporate OJP's Financial Guide and its non-supplanting provisions.

<u>THE NON-SUPPLANTING REQUIREMENT IN FEDERAL GRANTS</u>

40.     Importantly, and as Congress intended, the JAG-ARRA and Byrne Memorial JAG grants, and the ICAC cooperative agreements Defendants applied for and received contained non-supplanting provisions. The non-supplanting provision is one of the conspicuous, central restrictions Congress and DOJ places on the use of federal grant money.

41.     Applicants for, and recipients of, federal grants are required by law to comply with and certify compliance with non-supplanting requirements as a condition of receiving grants and payment of grant money.

42.     The failure to adhere to all grant requirements may result in the suspension or termination of funding or the imposition of other sanctions.

43.     Once DOJ awards a grant, a grant recipient's obligation to comply with non-supplanting provisions does not stop. Grant recipients have an ongoing responsibility to comply with the non-supplanting and other provisions of the grant and must routinely certify that they are using federal money in accordance with the grant's objectives and legal requirements.

44.     The JAG-ARRA program's non-supplanting requirement mandates that a recipient can only use grant money to increase the recipient's law enforcement budget. A recipient may not use federal grant money to reduce its budget by using federal grant money to replace state money it would have spent on the same activities absent the grant money.

45.     The DOJ's Office of Justice Programs' Financial Guide, which was incorporated into and referenced in all DOJ's grant programs explains:

**SUPPLANTING**

Federal funds must be used to supplement existing funds for program activities and must not replace those funds that have been appropriated for the same purpose. Supplanting will be the subject of application review, as well as preaward review, postaward monitoring, and audit. If there is a potential presence of supplanting, the applicant or grantee will be required to supply documentation demonstrating that the reduction in non-Federal resources occurred for reasons other than the receipt or expected receipt of Federal funds. For certain programs, a written certification may be requested by the awarding agency or recipient agency stating that Federal funds will not be used to supplant State or local funds.

46.     The Financial Guide further defines supplanting as "deliberately reduc[ing] State or local funds because of the existence of Federal funds."

47.     The Financial Guide also provides this example: "[W]hen State funds are appropriated for a stated purpose and Federal funds are awarded for that same purpose, the State replaced its State funds with Federal funds, thereby reducing the total amount available for the stated purpose."

48.     The application materials CCJJ used for state agencies to apply for JAG-ARRA subgrants contain several warnings about supplanting. First they warn that the grant funding "cannot be used to replace or supplant any budget item that is currently approved for funding by your legislative body." Second, they warn that applicants must be "certain in [their] budget not to request [grant] funding to replace any positions or items that are already approved for funding in

13

your current budget." Finally, they warn that "[f]ederal funds must be used to supplement existing funds for program activities and not replace those funds that have been appropriated for the same purpose."

49.     ARRA-JAG grant applications also referred applicants to DOJ's supplanting regulations, publicly accessible on OJP's website.

50.     A state government executive and the grant manager must sign the application. By signing the grant application, applicants certify that all information in the application is true and correct and that the applicant will comply with and monitor compliance with all legal and administrative requirements and assurances that govern the acceptance and use of federal grant money, including, importantly, the non-supplanting requirement.

51.     In addition to assurances in the grant application, grant recipients are also required to certify compliance with the grant's requirements as a precondition to payment of grant money. Pub. L. 111-5, § 2, 123 Stat. 287-88. This payment request certification consists of the submission of progress, performance measurement, and financial status reports.

52.     The progress report provides the status of the project and identifies any delays or issues. It includes the number of jobs created, retained or restored. Progress reports are uploaded to the OJP's Grants Management System.

53.     A Financial Status Report, and its successor Federal Financial Report, contain the actual costs a grant recipient incurred and any program revenue received.

54.     Each grant recipient on each Financial Status Report certifies the Report is correct and complete and that "all outlays and unliquidated obligations are for the purposes set forth in the award documents." Starting in January 2010, DOJ required recipients use the Federal

Financial Report, which requires the recipient to certify the report is "true, complete, and accurate to the best of [that person's] knowledge." It also requires the recipient to certify that she is "aware that any false, fictitious, or fraudulent information may subject [her] to criminal, civil, or administrative penalties." DOJ's guidance to recipients advises that by clicking the "submit" button in the Grants Management System, a recipient certifies that the report submitted to OJP is true, complete, and accurate.

55.     Grant recipients must also submit requests for grant money disbursements either by phone or on-line through DOJ's Grants Payment Request System. Often a request for disbursement is made by submitting a Financial Status Report. Prior to January 2011 most payments were requested by phone. If made through the Grants Payment Request System, only an authorized specialist could request disbursement through the system.

THE STATE OF UTAH APPLIED FOR AND
RECEIVED FEDERAL GRANTS

56.     DOJ awarded the State, through the Utah Commission on Criminal and Juvenile Justice ("CCJJ") the following grants from 2009 through 2011: 2009-SU-B9-0045, 2009-DJ-BX-0657, 2010-DJ-BX-0318, and 2011-DJ-BX-2082. DOJ also entered into three cooperative agreements with the Office of the Attorney General, all numbered 2009-MC-CX-KO53, for federal ICAC funding.

57.     When Defendants applied for federal grant money under the JAG-ARRA and Byrne Memorial JAG grant programs, and signed cooperative agreements for ICAC money, they represented and certified they would comply with the express non-supplanting provisions of federal grant programs.

15

58.     In addition, Defendants represented and certified that the information in the application was true and correct, they would comply with all assurances, and would comply with additional applicable requirements prior to receiving grant funding.

59.     CCJJ used the four grants it received to award multiple subgrants. It awarded eight subgrants to the Office of the Utah Attorney General, the Administrative Office of the Courts, the Department of Public Safety, Division of Juvenile Justice Services, and the Department of Corrections as follows:

| Grant | Subgrants | Amount | Grantee |
|---|---|---|---|
| **2009-SU-B9-0045** | | **$9,964,861** | **CCJJ** |
| | 9AR01 | $1,782,000 | Attorney General |
| | 9AR02 | $545,000 | Administrative Office of Courts |
| | 9AR03 | $453,861 | Department of Public Safety |
| | 9AR04 | $928,630 | Juvenile Justice Services |
| | 9AR05 | $957,422 | Department of Corrections |
| **2009-DJ-BX-0657** | | **$2,642,837** | **CCJJ** |
| | 9A21 | | Department of Corrections |
| **2010-DJ-BX-0318** | | **$2,541,633** | **CCJJ** |
| | 10A27 | | Department of Corrections |
| **2011-DJ-BX-2082** | | **$2,096,024** | **CCJJ** |
| | 11A27 | | Department of Corrections |

60.     All agencies that received subgrants certified that the information contained in the subgrant application was correct, met all grant requirements, and that the agency would comply with all provisions of the program, including OJP's Financial Guide.

61.     CCJJ served as the administrative agency for all of their subgrants. As the administrative agency, CCJJ oversaw the distribution of grant money and agency spending in accordance with the grants' objectives. CCJJ also submitted financial reports, programmatic reports, performance measurement data and subgrant information to DOJ. Finally, and perhaps most importantly, CCJJ was required to monitor all subgrant recipients' compliance with all of

16

the grants' special conditions and provisions, including, importantly, the non-supplanting provisions.

62.     The JAG-ARRA and Byrne Memorial JAG grants the State applied for and received (Nos. 2009-SU-B9-0045, 2009-DJ-BX-0657, 2010-DJ-BX-0318, and 2011-DJ-BX-2082), and the three ICAC cooperative agreements it signed (No. 2009-MC-CX-K053) expressly prohibited supplanting.

63.     The State and its agencies also knew that compliance with federal grant requirements was material to the United States' decision to award it grant money, was central to the United States' grant programs and was a condition of the grants being awarded and money being disbursed.

64.     As examples of materiality of the non-supplanting provision to federal grant programs, DOJ has terminated or taken action against grant recipients including state and local governments, for not complying with grant requirements:

A.     In 2009, the DOJ barred 25 state and local law enforcement agencies from receiving DOJ grants for violating the non-supplanting requirements.

B.     The DOJ has litigated or settled actions where it was alleged that grant awardees supplanted or did not comply with grant requirements. *See, e.g., Former Grant Administrator and Legal Assistant of American Samoa Non-profit Legal Aid Corporation Sentenced for Stealing Nearly $160,000 in Federal Grant Funds,* https://www.justice.gov/opa/pr/former-grant-administrator-and-legal-assistant-american-samoa-non-profit-legal-aid-0.

65.     Had DOJ known of Defendants' non-compliance with the non-supplanting provisions, it would have taken affirmative action.

<u>DEFENDANTS SUBMITTED FALSE CERTIFICATIONS</u>
<u>TO OBTAIN GRANT MONEY AND RECEIVE PAYMENT</u>

66.     Defendants knowingly submitted false and fraudulent assurances and certifications to obtain grants.

67.     Defendants knowingly assured DOJ when they submitted and signed grant applications and award documents that they were aware of the non-supplanting provisions and would follow the provisions.

68.     Defendants' assurances and certifications were false. Instead of complying with the grant's provisions, Defendants supplanted in express violation of the grants' terms.

69.     Defendants also falsely certified with each request for disbursement that they were not fraudulently submitting the request and were otherwise using the grant money for the objectives in the grant award documents.

70.     Defendants' failure to abide by Congressional rules established as conditions for a grant award disqualified the State from receiving federal money.

71.     In addition to the false assurances and certifications, CCJJ failed to properly monitor and ensure compliance with the non-supplanting requirements imposed on State agencies that received subgrants.

72.     CCJJ knew, or should have known, from emails, requests for payment, and reports agencies submitted to it and DOJ that the agencies were improperly supplanting. In particular, CCJJ knew, or should have known, the agencies were moving existing employees into grant-funded positions but not immediately filling the vacated positions with new hires; or that the agencies were using grant funds to pay current employee salaries while misrepresenting that the these positions would be, or were, eliminated in budget cuts.

73.     CCJJ failed to correct the supplanting violations and continued to certify compliance with the non-supplanting requirement in each progress report and payment request submitted to DOJ.

74.     Like CCJJ, the Office of the Attorney General knew, or should have known, through emails, requests for payment, and reports it submitted to DOJ that it was improperly supplanting. In particular, the Office of the Attorney General moved existing employees into grant-funded positions but did not immediately fill the vacated positions with new hires; or it was using grant funds to pay existing employee salaries while misrepresenting that the employees' positions would be, or were, eliminated by budget cuts.

75.     Even though Defendants knew they were not compliant, they certified agencies were complaint in order to obtain the following grants and continue to receive payments of federal money.

### GRANT 2009-SU-B9-0045
### Utah Commission on Criminal and Juvenile Justice

76.     CCJJ applied for and received $9,964,861 in part to fund five "quickstart" projects through subgrants to five state agencies: 1) the Utah Attorney General's Office (subgrant 9AR01); 2) the Administrative Office of the Courts (subgrant 9AR02); 3) the Department of Public Safety (subgrant 9AR03); 4) the Division of Juvenile Justice Services (subgrant 9AR04); and 5) the Department of Corrections (subgrant 9AR05). CCJJ represented that the funding through these projects would create, retain, or restore 45 jobs.

77.     The stated grant period was March 31, 2009 to June 30, 2013.

78.     Ronald Gordon, the Executive Director of CCJJ, signed the application and certified that CCJJ was aware of and would not violate the grant's non-supplanting requirements.

19

Richard Zebarth, CCJJ's grant manager, wrote and caused the application to be submitted to DOJ.

79.     CCJJ expressly notified agencies of the supplanting provision by including the following warning in its non-supplanting certification:

> **Supplanting -** *JAG - ARRA stimulus funding cannot be used to replace or supplant any budget item that is currently approved for funding by your legislative body. Be certain in your budget not to request JAG funding to replace any positions or items that are already approved for funding in your current budget. See USDOJ supplanting regulations:* http://www.ojp.usdoj.gov/recovery/supplantingguidance.htm

80.     CCJJ also expressly described for the agencies in its non-supplanting certification how to comply with the non-supplanting provisions:

**Utah JAG - ARRA positions funded from the grant are allowable under the following scenarios:**

**1)  Create a New Position with JAG - ARRA Funding -** In this scenario JAG - ARRA funding is used to hire a person to fill a position approved in the agency JAG grant awarded by CCJJ. In a created position a new hire is added to the existing staff of the agency, paid from the JAG grant and the position is limited to working on approved project purposes (i.e. the agency is allowed to bill the grant only for those hours and purposes approved in the grant). It is advisable that the hiring agency establish the grant funded position as time limited since the JAG - ARRA award is one-time funding and will not be continued by CCJJ. This new position should add to the existing staff and not merely transfer the cost of an existing position from the agency to the JAG-ARRA grant.

**2) Retaining a Position Lost Due to Budget Cuts -** JAG - ARRA grant funding can used to maintain a staff position within the grant awarded agency that would otherwise have been lost due to budget cuts. Having a position that "might" be lost is not allowable. The agency must be able to produce proof in their budget and or other verifiable legislation that would indicate that this position was terminated due to budget cuts. When an employee is retained with JAG - ARRA funding that employee will need to work only on the approved grant funded purposes. If an agency was awarded JAG - ARRA funding and is paying salary for a position that ended up not being cut from the agency budget then the supplanting is occurring. In this case the agency will have to immediately back-fill the old position (as in item 3 below) or terminate the grant and return any JAG funding to CCJJ that was used to pay salary.

**3) Use an Existing Employee to Fill a JAG - ARRA Funded Position and Back-fill the Old Position -** It is okay for an agency to pay the salary of an existing employee with JAG - ARRA grant funding, but that position must be working only on the approved purposes of the grant. Additionally, the position that the existing employee vacated to take the JAG - ARRA position will need to be back-filled immediately with an agency funded (time limited) new hire in order to avoid supplanting. No grant funding should be used to pay the salary of an existing employee until the back-fill position is hired and being paid from agency funds. If the agency in this situation fails to hire the back-fill position for the vacated position it is supplanting and the JAG grant may need to be terminated by CCJJ or the back-fill position immediately hired before grants funds are used to pay any salary.

81.     Each agency executive or grant manager signed the non-supplanting certification acknowledging understanding of the non-supplanting provisions and agreeing to comply.

82.     Beginning on June 18, 2009, and ending on May 16, 2013, CCJJ or the agencies that received subgrants requested 17 disbursements from this grant. In connection with each request, CCJJ submitted a Financial Status Report or Federal Financial Report. A CCJJ financial manager submitted these disbursement requests.

83.     Although the certification language in the reports changed over time, in each disbursement request, CCJJ expressly certified the report was truthful, correct, complete, did not contain fraudulent information and the money was or would be used for the purposes as explained in the grant's award documents. By doing this, CCJJ certified that it was in compliance with the grant's requirements, including the non-supplanting provisions.

84.     CCJJ and the agencies knew, or should have known, they were not compliant with non-supplanting provisions, a condition of disbursement, when they submitted claims for disbursement and were therefore not entitled to federal grant money. This resulted in CCJJ submitting or causing it to submit false claims for payment to the DOJ in violation of the False Claims Act.

### *Subgrant 9AR01*
### *Attorney General's Office*

85.     The Attorney General's Office ("Attorney General") received $1,782,000 to form the Statewide Enforcement of Crimes by Undocumented Residents Task Force. It stated it would use the grant money to preserve existing jobs of three full-time employees and to hire three new full-time employees who would be entirely and exclusively dedicated to task force activities.

86.     Kirk Torgensen, the Chief Criminal Deputy at the Attorney General's Office, and Leo Lucy, Assistant Section Chief, signed the application and thereby certified that the Attorney General was aware of and would not violate the grant's non-supplanting requirements.

87.     Rhett McQuiston, Supervisory Special Agent, signed the CCJJ supplanting certification.

88.     The Attorney General identified Leo Lucey and Cord Skinner as two employees whose positions it retained using grant money.

89.     Shortly after the Attorney General received the subgrant, however, it transferred Lucey and Skinner to other positions within the office. It then transferred employees who were already working in the office to Lucey and Skinner's vacated positions and never filled the transferred employees' positions.

90.     The Attorney General supplanted by transferring Lucey and Skinner and then filling their vacated positions with existing employees. By doing so, it wrongfully replaced money in its budget with federal grant money.

91.     The Attorney General admitted its wrongdoing in a response to a records request on December 3, 2015:

> 1.     In your records request, you ask for records regarding reductions in force of the positions of two named persons.  You ask for records identifying employees that backfilled positions vacated by certain employees.  Finally, you ask for records regarding backfilling positions vacated by certain persons.  Your request, therefore, is based on the premise that there were RIF's (reductions in force) and that positions were backfilled to fill vacancies.  Your premise is incorrect, however.  There were no such reductions in force and no such backfilling to fill vacancies.  Since you are asking for records of something that did not happen, there are no records responsive to your request.

### Subgrant 9AR02
### Administrative Office of the Courts

92.     The Administrative Office of the Courts received $545,000 to retain or rehire several clerical positions.

93.     Daniel Becker, Court Administrator, and Kim Allard, Program Manager, signed the application and thereby certified that the Courts was aware of and would not violate the grant's non-supplanting requirements.

94.     Kim Allard signed the CCJJ supplanting certification.

95.     The clerical positions Courts claimed it would lose in the absence of federal grant money were actually vacant positions it did not fill because of attrition and a hiring freeze. The Courts hired only one person for approximately 6 months, but otherwise used the grant money to pay existing employee salaries.

96.     Courts paid existing employees Mandi Rohrer, Lisa Pickering, Jackie Taylor, Lacie Downs, Brady Petersen, Ashlee Wilson, Jay Mills, Earline Matheson and Lorene Childs with federal grant money and did not fill any of positions it claims it would lose.

97.     Courts used federal grant money to retain these clerk positions it knew it would not lose through budget cuts. By doing so, it wrongfully replaced money in its budget with federal grant money.

### Subgrant 9AR03
### Department of Public Safety

98.      The Department of Public Safety ("Public Safety") received $453,861 to retain two computer forensic examiners and one ICAC Task Force investigator. Public Safety claimed that it would lose these positions because of budget cuts.

23

99.     Rich Townsend, the Deputy Commissioner and Mike Rapich signed the application and thereby certified that Public Safety was aware of and would not violate the grant's non-supplanting requirements.

100.     Mike Rapich signed the CCJJ supplanting certification.

101.     Public Safety moved existing employees Steve Gamvroulas, Terry Sparks, and Daniel Hooper to grant-funded positions and then did not fill the vacated positions.

102.     Public Safety used federal grant money to retain positions it knew it would not lose to budget cuts. By doing so, it improperly replaced money in its budget with federal grant money.

### *Subgrant 9AR04*
### *Division of Juvenile Justice Services*

103.     The Utah Division of Juvenile Justice Services ("Division") received $928,630 to restore 13 positions it claimed it eliminated because of budget cuts.

104.      Dan Maldonado, Division Director, and Tom Darais, Federal Revenue Manager, signed the application and thereby certified that the Division was aware of and would not violate the grant's non-supplanting requirements.

105.     Tom Darais signed the CCJJ supplanting certification.

106.     The Division did not eliminate any positions. It transferred 11 employees it claimed to have terminated because of budget cuts to other positions within the Division and did not fill the vacated positions. The other two positions were vacant positions.

107.     The Division used federal grant money to pay the salaries of existing employees K. Storey, P. Hill, K. Havea, J. Coggins, M. Murry, C. Turk, D. Nuno, J. Sanchez, T. Rodriguez, A. Allsup, S. Lupeamanu and W. Singletary.

108.     The Division improperly used federal grant money to retain these positions because it knew it would not lose the positions to budget cuts. In fact, the Utah Legislature reinstated "on going funding" for two of the positions during the time the Division was receiving federal grant money to pay the salaries of these same two positions. By doing so, it wrongfully replaced budgeted money with federal grant money.

### *Subgrant 9AR05*
### *Department of Corrections*

109.     The Department of Corrections ("Corrections") received $957,422 to hire 6 new Offender Employment Coordinators for the Employment Placement Program.

110.     Robyn Williams, Deputy Director and Geri Miller signed the application and thereby certified that Corrections was aware of and would not violate the grant's non-supplanting requirements.

111.     Daniel Chestnut signed the CCJJ supplanting certification.

112.     Rather than hire new employees, Corrections used federal grant money to pay the salaries of existing employees T. Cottrel, J. Williams, J. Wifaon, C. Gunderson, T. Cressall and E. Price.

113.     Corrections did not immediately fill the vacated positions with new hires.  One position was never filled.

114.     By doing so, Corrections wrongfully replaced budgeted money with federal grant money.

### Grant 2010-DJ-BX-0318
### Commission on Criminal and Juvenile Justice

115.    CCJJ received $2,541,633, of which it awarded $773,472 through a subgrant

(10A27) to the Department of Corrections ("Corrections") to continue the Employment

Placement Program and retain the positions funded under subgrant 9AR05.

116.    The stated grant period was September 30, 2011 to June 30, 2013.

117.    Ronald Gordon, Executive Director of CCJJ and Richard Ziebarth, Grant Program

Manager, signed the application and thereby certified that CCJJ was aware of and would not

violate the grant's non-supplanting requirements.

118.    Robyn Williams, Deputy Executive Director and Jeffrey Wilson, Supervisor,

signed the CCJJ application and thereby certified that Corrections was aware of and would not

violate the grant's non-supplanting requirements. Jeffrey Wilson signed the CCJJ non-

supplanting certification.

119.    CCJJ knew of this grant and grants 2011-DJ-BX-2082 and 2009-DJBX-0657

prohibited supplanting because it notified the agencies of the non-supplanting provision. Each

agency's executive or program manager signed the application documents for a subaward and

thereby the following provision:

#### (APPENDIX 1)
#### CERTIFIED ASSURANCES & GRANT CONDITIONS
#### Utah Justice Assistance Grant Program

1.  The applicant assures that grant funds awarded under the Justice Assistance Grant program (JAG),
authorized by Congress and administered by the U.S. Department of Justice - Bureau of Justice Assistance
(BJA) **will not supplant State or local funds.** Federal funds must be used to supplement existing funds for
program activities and not replace those funds that have been appropriated for the same purpose.

121.    Corrections used the grant money to pay existing employee salaries. Corrections

transferred the employees paid under subgrant 9AR05 to this subgrant.

26

122.    Corrections did not immediately fill the vacated positions from 9AR05 with new hires. Funding for these position continued to this grant.

123.    Beginning on August 17, 2010, and ending on November 12, 2013, CCJJ requested 16 disbursements from this grant. In connection with each request, CCJJ submitted a Financial Status Report of Federal Financial Report. A CCJJ financial manager submitted these disbursement requests.

124.    In each request for disbursement, CCJJ expressly certified the report was true, complete, and accurate and that any false, fictitious, or fraudulent information would subject the person and entity submitting the report to criminal, civil, or administrative penalties. By submitting the request for disbursement, CCJJ certified that it was in compliance with the grant's requirements, including the non-supplanting provisions.

125.    CCJJ knew, or should have known, when it requested and submitted claims for disbursement of federal grant money it and Corrections were not compliant with the non-supplanting provisions of the grant. This caused CCJJ and Corrections to submit false claims for payment to the DOJ in violation of the False Claims Act.

### Grant 2011-DJ-BX-2082
### Commission on Criminal and Juvenile Justice

126.    CCJJ received $2,096,024 to fund units of state and local government and private providers of criminal justice services.

127.    Ronald Gordon, Executive Director of CCJJ, and Richard Ziebarth, Grant Manager, signed the application and thereby certified that CCJJ was aware of and would not violate the grant's non-supplanting requirements.

128.     One of the funding priorities CCJJ identified in its program narrative was the continuation of the Department of Corrections ("Corrections") Employment Placement Project. Its purpose was to increase the effectiveness of Corrections' responsibility to assist incarcerated individuals with transition and re-entry into the community and with obtaining post-incarceration employment.

129.     Corrections initially received $958,442 under subgrant 9AR05 and then an additional $773,472 under subgrant 10A27 for the Employment Placement Project.

130.     Corrections then received $650,000 for the continuation of the Employment Placement Project under subgrant 11A27, with almost all of the money budgeted to pay the salaries of the Offender Employment Coordinators/Agents.

131.     Corrections used federal grant money to pay existing employee salaries. Corrections transferred the employees it paid under subgrant 10A27 to subgrant 11A27. Corrections did not immediately fill the vacated positions from grant 9AR05 that continued to grant 11A27.

132.     Jeffrey Wilson and London Stromberg signed the application for grant 11A27 and thereby certified that Corrections was aware of and would not violate the grant's requirements.

133.     By doing so, it wrongfully replaced budgeted money with federal grant money.

134.     Corrections also billed the United States twice for several Employment Placement Program agents' salaries.

135.     On August 1, 2011, Corrections requested payment for $18,042 for pay period April 16, 2011 — April 29, 2011 and April 30, 2011 — May 13, 2011, and then also requested another $18,402 for the pay period April 20, 2011 — May 13, 2011.

136.     As another example, on October 23, 2012, Corrections submitted a request for payment for $20,044 for the pay period ending October 12, 2012. In January 2013, Corrections again submitted a request for payment for another $20,044 for same pay period ending October 12, 2013.

137.     Despite knowing of the double billing, Corrections did nothing to report it to CCJJ or DOJ and never attempted to pay back the money.

138.     Beginning on August 31, 2011, and ending on November 26, 2014, CCJJ requested 16 disbursements from this grant. In connection with each request, CCJJ submitted a Financial Status Report or Federal Financial Report. A CCJJ financial manager submitted these disbursement requests.

139.     In each disbursement request CCJJ expressly certified the report was true, complete, and accurate and that any false, fictitious, or fraudulent information would subject the person and entity submitting the report to criminal, civil, or administrative penalties. By so certifying, CCJJ certified that it and Corrections was in compliance with the grant's requirements, including the applicable non-supplanting provisions.

140.     CCJJ knew, or should have known, when it requested disbursements and submitted claims for federal grant money that it and Corrections were not compliant with the non-supplanting provisions of the grant. This caused CCJJ and Corrections to submit false claims for payment to the DOJ in violation of the False Claims Act.

### Grant 2009-DJBX-0657
### Commission on Criminal and Juvenile Justice

141.     CCJJ received $2,642,837, to enhance statewide public service services and support statewide narcotics interdiction and prevention services. CCJJ awarded several subgrants

29

to State agencies from this grant, including one to the Department of Corrections ("Corrections").

142.    Ronald Gordon, the Executive Director of CCJJ signed the application and certified that CCJJ was aware of and would not violate the grant's non-supplanting requirements. Richard Zebarth, CCJJ's grant manager, wrote the application and submitted or caused to be submitted the application to DOJ.

143.    Beginning on August 20, 2009, and ending on January 30, 2013, CCJJ requested 17 disbursements from this grant. In connection with each request, CCJJ submitted a Federal Financial State Report of Financial Report. A CCJJ financial manager submitted these disbursement requests.

144.    In each disbursement request, CCJJ expressly certified the report was true, complete, and accurate and that any false, fictitious, or fraudulent information would subject the person and entity submitting the report to criminal, civil, or administrative penalties. By so certifying, CCJJ certified that it and Corrections were in compliance with the grant's requirements, including the non-supplanting provisions.

145.    CCJJ and Corrections knew, or should have known, when they requested and submitted claims for disbursement they were not compliant with the non-supplanting provisions of the grant. This caused CCJJ and Corrections to submit false claims for payment to the DOJ in violation of the False Claims Act.

### *Subgrant 9A21*
### *Department of Corrections*

146.    The Department of Corrections ("Corrections") received $29,775 for Moral

Reconation Therapy training software and later received $37,389 to pay the salaries of six part-

time scanning technicians.

147.    Corrections submitted a grant adjustment request to CCJJ and requested to use

remaining funds from this grant to pay salaries of the scanning technicians and claiming the

wages were funded by another grant that it had depleted.

148.    Tom Patterson, Executive Director, and Mike Haddon, Deputy Director signed

the application and thereby certified that the Corrections was aware of and would not violate the

grant's non-supplanting requirements.

149.    Mike Haddon signed the CCJJ supplanting certification.

150.    Corrections stated in the grant adjustment request that it had used all available

funding from other DOJ grants to pay the scanning technician salaries.

151.    Corrections improperly used federal grant money to train staff on Moral

Roconation Training when it already had a contract with Correctional Counseling, Inc., to

provide the training. The contract with Correctional Counseling, Inc., was effective from October

15, 2009, through October 14, 2012, to pay for e-learning software.

*Cooperative Agreement 2009-MC-CX-K053*
*Utah Attorney General's Office*

152.    The Office of the Attorney General ("Attorney General") received three separate awards for continuation of its ICAC Task Force. It received $268,806 in 2009, $263,316 in 2010 and $271,874 in 2011.

153.    Kirk Torgensen signed the award documentation and was the authorized representative. Jessica Farnsworth was listed as the point of contact on all reports the Attorney General uploaded to DOJ's grants management system.

154.     DOJ, in connection with these grants, required recipients to establish and maintain adequate accounting systems and financial records and to accurately account for awarded funds.

155.    The Attorney General used this grant money to pay agent salaries, but failed to accurately track and charge the agents' time.

156.    The Attorney General also improperly used $602,600 to pay the salaries of agents who were not assigned to the ICAC program—the program for which the funds were dedicated.

157.    The Attorney General also likely supplanted, although this is difficult to confirm because of the Attorney General's inadequate and inaccurate accounting.

116.    The Attorney General's Office knew of the award's prohibition of supplanting because the award documentation required:



> *SPECIAL CONDITIONS*
>
> 1.  The recipient agrees to comply with the financial and administrative requirements set forth in the current edition of the Office of Justice Programs (OJP) Financial Guide.

158.     Beginning on November 5, 2009 and ending on January 10, 2013, the Attorney General requested 14 disbursements from this grant. Each request was made either by phone or through DOJ's Grant Payment Request System.

159.     In each disbursement request, the Attorney General authorized user and person submitting the requests expressly certified the report was true, complete, and accurate and that any false, fictitious, or fraudulent information would subject the person submitting the request to criminal, civil, or administrative penalties. By submitting the requests for disbursement, the Attorney General certified it was in compliance with the grant's requirements, including the non-supplanting provisions.

<u>DEFENDANTS' MISREPRESENTATIONS</u>

160.     Defendants made materially false representations to obtain federal grant money and to continue receiving federal grant money. Among those materially false representations, Defendants represented that they lost jobs or would lose jobs to budget cuts.

161.     In each instance, the agency that represented it did or would lose jobs had a budget surplus or had cuts restored before federal grants expired.

162.     CCJJ misrepresented, for example, that 45 jobs would be created, retained or restored by grant money. The State did not create, retain, or restore 45 jobs using grant money because it was not immediately filling positions vacated by employees it moved to grant-funded positions.

163.     Public Safety misrepresented that it needed grant money to create, retain, or restore positions it lost or would lose because of budget cuts. In reality, the Utah Legislature appropriated to Public Safety enough money that Public Safety had millions of dollars in budget

surpluses and had sufficient money from state appropriations to pay for the salaries of all employees it paid with federal grant money. In fact, from 2009 to 2011 Public Safety had an average budget surplus of $27 million.

164.    The Division of Juvenile Justice Services ("Division") misrepresented that it needed federal grant money to create, retain, or restore 13 positions. In reality, the Utah Legislature appropriated to the Division enough money that the Division had sufficient money from state appropriations to pay for the salaries of all employees it paid with federal grant money. In fact, the Division from 2009 through 2010 had an average budget surplus of $1 million.

165.    The Utah Legislative Auditor General confirmed the misrepresentations made by the State in audits it conducted of the Department of Corrections.

166.    In an audit conducted in 2013, the Legislative Auditor General concluded that the Department of Correction's elimination of jobs led to a large surplus. The audit concluded that Corrections from fiscal years 2008 to 2011, added about $10 million to its carry-forward funds, reaching a balance of $19.6 million. In fiscal year 2012, Corrections added another $5.6 million for a year-end carry-forward balance of $25.2 million.

167.    During this time, the Executive Director of Corrections testified before the Utah Legislature that it would be forced to reduce employees and release inmates from prison early if Corrections' budget was further cut. The Director specifically testified that a three percent cut would be $6.9 million, and the consequences would be the early release of 384 inmates and loss of approximately 75 staff positions.

168.    The Auditor also noted that Corrections provided career ladder salary increases to over 500 employees using funds accumulated from vacant positions. Some of these were positions left vacant and not immediately filled when existing employees were moved to grant-funded positions.

169.    The State and its agencies have claimed that they did not immediately fill vacated positions because of a state-wide hiring freeze. *See* Executive Order 2009-05-EO: *Implementing a Statewide Budget Reduction through June 30, 2010*. A hiring freeze provides Defendants no legal justification to supplant.

170.    Defendants knowingly submitted false claims when they certified compliance with (1) the federal statutory non-supplanting mandate that grantees not use grant funds to replace state or local "funds that would, in the absence of federal funds, be made available for law enforcement activities," (42 U.S.C. § 3752(1)); (2) the statutory requirement that "all the information contained in the [grant] application is correct" (Id. § 3752 (5)(B)); and (3) the requirements to expend grant funds only for purposes and activities covered by approved project activities and budget.

171.    In the end, Defendants obtained millions of dollars in federal funds that they were not entitled to receive because of their fraud and false certifications.

**FIRST CAUSE OF ACTION**
**False Claims Act: Presentation of False Claims**
**31 U.S.C. § 3729(a)(1)(A)**

172.    The United States repeats and realleges each allegation in ¶¶ 1 through 171, as if fully set forth herein.

173.     Defendants knowingly presented or caused to be presented false or fraudulent claims for payment to the United States.

174.     By virtue of the false or fraudulent claims made by Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, plus a civil penalty of $22,363 for each violation.

## SECOND CAUSE OF ACTION
### False Claims Act: Making or Using False Record or Statement
### 31 U.S.C. § 3729 (a)(1)(B)

175.     The United States repeats and realleges each allegation in ¶¶ 1 through 174, as if fully set forth herein.

176.     Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States.

177.     By virtue of the false records or statements made by Defendants the United States suffered damages and therefore is entitled to treble damages under the False Claims Act plus a civil penalty of $22,363 for each violation.

## THIRD CAUSE OF ACTION
### False Claims Act: Reverse False Claims
### 31 U.S.C. § 3729(a)(1)(D)

178.     The United States repeats and realleges each allegation in ¶¶ 1 through 177, as if fully set forth herein.

179.     Defendants knowingly made, used or caused to be made or used a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the United States.

180.     By virtue of the false records or statements made by Defendants, the United

States suffered damages and therefore is entitled to treble damages under the False Claims

Act plus a civil penalty of $22,363 for each violation.

## FOURTH CAUSE OF ACTION
### Common Law Fraud

181.    The United States repeats and realleges each allegation in ¶¶ 1 through 180, as if

fully set forth herein.

182.    This is a civil action brought by the United States against Defendants under

the common law for fraud.

183.    Defendants made false claims regarding the use of federal grant money. These

false claims were misrepresentations of material fact, they were made with knowledge of their

falsity and/or with reckless disregard for their truth, and with the intent that they be relied upon

by the United States.

184.    The United States had the right to rely upon these representations. Acting without

knowledge of the falsity of these representations and in reliance upon Defendants'

misrepresentations, the United States paid these false claims and has been damaged in an amount

to be determined.

## FIFTH CAUSE OF ACTION
### Payment Under Mistake of Fact

185.    The United States repeats and realleges each allegation in ¶¶ 1 through 184, as if

fully set forth herein.

186.    This is a civil action brought by the United States against Defendants under the

common law for payment under mistake of fact.

187.    By virtue of the forgoing, under a mistake of fact, the United States paid or reimbursed Defendants in the belief that defendants had accurately represented the use of federal grant monies. Defendants took these monies with notice of the payment made under mistake of fact.

188.    Had the true facts been known, the United States would not have paid the claims presented by Defendants for payment.

189.    By reason of its payments, the United States has been damaged in an amount to be determined.

## SIXTH CAUSE OF ACTION
### Unjust Enrichment

190.    The United States repeats and realleges each allegation in ¶¶ 1 through 189, as if fully set forth herein.

191.    This is a civil action brought by the United States against Defendants under the common law for unjust enrichment.

192.    By virtue of the forgoing, Defendants were unjustly enriched by the United States' payment or reimbursement of the above described acts, and have been unjustly enriched to the extent of such payments or reimbursements. Defendants took these monies with notice that they were being unjustly enriched.

193.    By reason of the United States' payments which were paid solely as a result of Defendants' failure to reflect truthfully how grant monies were being expended, Defendants received monies to which they were not entitled and has thereby been unjustly enriched in an amount to be determined.

## SEVENTH CAUSE OF ACTION
### Negligent Misrepresentation

194.    The United States repeats and realleges each allegation in ¶¶ 1 through 193, as if fully set forth herein.

195.    This is a civil action brought by the United States against Defendants under the common law for negligent misrepresentation.

196.    In the course of its business, Defendants made false representations to the United States. Defendants had a pecuniary interest in making the statements. Defendants owed a duty of care to see that it communicated truthful information to the plaintiff. Defendants failed to exercise reasonable care or competence in communicating the information to plaintiff. Defendants breached the duty of care owed to plaintiff by failing to exercise due care.

197.    The United States justifiably relied on the representation.

198.    The United States suffered a pecuniary loss as the proximate result of reliance upon the misrepresentations in an amount to be determined.

## EIGHTH CAUSE OF ACTION
### Breach of Contract

199.    The United States repeats and realleges each allegation in ¶¶ 1 through 198, as if fully set forth herein.

200.    This is a civil action brought by the United States against Defendants for breach of contract.

201.    Defendants by signing and submitting grant applications, grant award documents, and other assurance and certifications entered into a valid, binding contracts with the United States.

202.   Defendants contracted to comply with all provisions of the grants they applied for, including the non-supplanting provisions.

203.   The United States performed or was excused from performance under the contract.

204.   Defendants materially breached their contacts with the United States by not complying with grant requirements, including non-supplanting provisions, as described in this Complaint.

205.   The United States suffered a pecuniary loss as result of Defendants' breached in an amount to be determined.

## NINTH CAUSE OF ACTION
### Breach of Covenant of Good Faith and Fair Dealing

206.   The United States repeats and realleges each allegation in ¶¶ 1 through 205, as if fully set forth herein.

207.   This is a civil action brought by the United States against Defendants for breach of the covenant of good faith and fair dealing.

208.   There is implied in every contract a covenant of good faith and fair dealing.

209.   The United States and Defendants entered into valid, binding agreements.

210.   Defendants owed the United States a duty of good faith and fair dealing.

211.   Defendants breached their duty of good faith and fair dealing by failing to comply with grants requirements, including non-supplanting provisions, as described in this Complaint.

212.   The United States suffered a pecuniary loss as result of Defendants' breach in an amount to be determined.

40

WHEREFORE, the United States demands judgment against Defendants as follows:

A.      On Count One, False Claims Act, judgment against the Defendants, for treble its damages, for the number of civil penalties allowable by law, in an amount as the Court may determine between $11,181 and $22,363 for each violation, plus such other relief as the jury deems appropriate and just;

B.      On Count Two, False Claims Act, judgment against the Defendants, for treble its damages, for the number of civil penalties allowable by law, in an amount as the Court may determine between $11,181 and $22,363 for each violation, plus such other relief as the jury deems appropriate and just;

C.      On Count Three, False Claims Act, judgment against the Defendants, for treble its damages, for the number of civil penalties allowable by law, in an amount as the Court may determine between $11,181 and $22,363 for each violation, plus such other relief as the jury deems appropriate and just; and

D.      On Count Four, Common Law Fraud, for (a) damages in an amount to be determined, costs and interest; (b) a judgment declaring that those monies are rightfully the property of the United States, and that the Defendants hold said monies in trust for the use and benefit of the United States, and/or (c) a judgment that the United States holds an equitable lien with respect to those monies;

E.      On Count Five, Payment Under Mistake of Fact, for the amount (a) of monies of which the United States mistakenly paid to the defendants, plus pre-judgment interest, fees and costs, and/or (b) a judgment declaring that those monies are rightfully the property of the United States, and that the Defendants hold said monies in trust for the use and benefit of the United

States, and/or (c) a judgment that the United States holds an equitable lien with respect to those

monies;

       F.      On Count Six, Unjust Enrichment for (a) the amount they were unjustly enriched,

plus pre-judgment interest, fees and costs, and/or (b) a judgment declaring that those monies are

rightfully the property of the United States, and that the Defendants hold said monies in trust for

the use and benefit of the United States, and/or (c) a judgment that the United States holds an

equitable lien with respect to those monies;

       G.      On Count Seven, Negligent Misrepresentation for (a) damages in an amount to be

determined, together with costs and interest; (b) a judgment declaring that those monies are

rightfully the property of the United States, and that the Defendants hold said monies in trust for

the use and benefit of the United States, and/or (c) a judgment that the United States holds an

equitable lien with respect to those monies;

       H.      On Count Eight, Breach of Contract for (a) damages in an amount to be

determined, together with costs and interest; (b) a judgment declaring that those monies are

rightfully the property of the United States, and that the Defendants hold said monies in trust for

the use and benefit of the United States, and/or (c) a judgment that the United States holds an

equitable lien with respect to those monies;

       I.      On Count Nine, Breach of Covenant of Good Faith and Fair Dealing for (a)

damages in an amount to be determined, together with costs and interest; (b) a judgment

declaring that those monies are rightfully the property of the United States, and that the

Defendants hold said monies in trust for the use and benefit of the United States, and/or (c) a

judgment that the United States holds an equitable lien with respect to those monies

J.      And for all other and further relief as the Court may deem just and equitable.

K.      For pre-judgment interest, post-judgment interest, fees and costs, as the jury

deems appropriate and just.

Respectfully submitted this 10th day of April 2020.

JOHN W. HUBER
United States Attorney
District of Utah


*/s/ Joel A. Ferre*
SANDRA L. STEINVOORT
JOEL A. FERRE
Assistant United States Attorneys
District of Utah