ANDREA T. MARTINEZ, Acting United States Attorney (#9313)
SANDRA L. STEINVOORT, Assistant United States Attorney (#5352)
JOEL A. FERRE, Assistant United States Attorney (#7517)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite #1800
Salt Lake City, Utah 84111-2176
Telephone: (801) 524-5682
Email: sandra.steinvoort@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* REGINALD WILLIAMS,<br><br>    Plaintiff,<br><br>    v.<br><br>ROBYN WILLIAMS, RONALD GORDON, RICHARD ZIEBARTH, KIRK TORGENSEN, THOMAS PATTERSON, LONDON STROMBERG, MIKE RAPICH, DAN MALDONADO, DANIEL BECKER, RHETT MCQUISTON, TOM DARAIS, JEFFERY WILSON, MIKE HADDON, KIM ALLARD, DANIEL CHESNUT, LEO LUCEY, RICH TOWNSEND, GERI MILLER, and the STATE OF UTAH,<br><br>    Defendants. | Case No. 2:15–cv–00054–RJS–DBP<br><br>**UNITED STATES' THIRD AMENDED COMPLAINT IN INTERVENTION**<br><br>Chief District Judge Robert J. Shelby<br><br>Chief Magistrate Judge Dustin B. Pead |

## NATURE OF THE ACTION

1.      This is a civil grant fraud action.

2.      The State of Utah (the "State") applied for and received four grants from the United States Department of Justice ("DOJ") and entered into three cooperative agreements with DOJ.

3.      As an applicant for and recipient of federal money, the State was required to certify that it would and actually did meet all federal grant program requirements.

4.      Instead of meeting these requirements and properly using the grant money, however, the State misused the grant money to replace rather than supplement state money. In particular, the State and the agencies the other Defendants worked for used federal grant money to pay salaries of existing State employees and did not, when required, immediately fill vacated positions. This amounted to the State supplanting rather than supplementing agency budgets in violation of the grant requirements and certifications made to DOJ.

5.      Because of false certifications Defendants submitted or caused to be submitted to the United States, the United States erroneously awarded the State and its agencies millions of dollars. The United States provided this money through the United States Department of Justice's Edward Byrne Memorial Justice Assistance Grant ("JAG") Program, the JAG - American Recovery Reinvestment Act ("ARRA") Program, and the Internet Crimes Against Children ("ICAC") Task Force Continuation Program.

6.      Defendants violated the federal False Claims Act by knowingly submitting or causing to be submitted false claims for payment to the United States. *See* 31 U.S.C. § 3729(a). Defendants' actions also resulted violation of the common law and equitable theories of fraud,

payment by mistake, unjust enrichment, negligent misrepresentation, breach of contract, and breach of the contract covenant of good faith and fair dealing.

## JURISDICTION AND VENUE

7.      The United States brings this action under the False Claims Act and under common law and equitable theories of fraud, payment by mistake, unjust enrichment, negligent misrepresentation, breach of contract, and breach of the contract covenant of good faith and fair dealing. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345, 1367(a) and 31 U.S.C. § 3730(a).

8.      The Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331, 1345, and 1367 because Defendants reside, can be found, and transact business in the District of Utah, and because they committed acts in this district that violated 31 U.S.C. § 3729.

9.      Venue under 28 U.S.C. § 1391(b) is proper because Defendants reside, can be found, and transact business in the District of Utah, and because a substantial part of the acts giving rise to the United States' claims occurred in the District of Utah.

## PARTIES

10.     The United States is the plaintiff. The Department of Justice ("DOJ") is an agency of the United States. DOJ, through its Office of Justice Programs ("OJP"), administers the JAG, JAG – ARRA, and ICAC Task Force Continuation grant programs.

11.     Relator Reginald Williams ("Relator") is an individual and inmate of the Utah Department of Corrections residing in the Gunnison Correctional Facility in Gunnison, Utah.

Relator initiated this action on or about January 1, 2015, by filing a Complaint under the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b)(1). The United States has intervened and assumed control of Relator's action under 31 U.S.C. § 3730(b)(4), and files this superseding Third Amended Complaint in Intervention.

12.     Defendant Ronald Gordon is an employee of the State of Utah and was the executive director of the Utah Commission on Criminal and Juvenile Justice ("CCJJ"). He signed grant applications CCJJ submitted to DOJ. By doing so, he attested to the truth and accuracy of the applications and agreed for himself and CCJJ to comply with the grants' requirements. He also had signing authority for the subgrant awards CCJJ made to numerous agencies. As the Executive Director he was responsible for CCJJ's compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

13.     Defendant Richard Ziebarth is an employee of the State of Utah and is the Grant Manager for CCJJ. He prepared and drafted the grant applications CCJJ submitted to DOJ.  He is responsible for submitting and causing others to submit false claims to the United States.

14.     Defendant Kirk Torgensen was an employee of the State of Utah and was the Criminal Chief Deputy of the Office of the Attorney General. He signed grant applications the Office of the Attorney General submitted to CCJJ and DOJ. By doing so, he attested to the truth and accuracy of the applications and agreed for himself and the Utah Attorney General's Office to comply with the grants' requirements. The Utah Attorney General's Office also designated him as the authorized official for one of the ICAC program cooperative agreements. As Criminal Chief Deputy, he was responsible for the Office of the Attorney General's compliance with all

4

grant requirements and for submitting and causing others to submit false claims to the United States.

15.     Defendant Thomas Patterson was an employee of the State of Utah and was the Executive Director of the Department of Corrections ("Corrections"). He signed one of the grant applications Corrections submitted to CCJJ. By doing so, he attested to the truth and accuracy of the application and agreed for himself and Corrections to comply with the grant's requirements. As the Executive Director he was responsible for Corrections' compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

16.     Defendant Robyn Williams was an employee of the State of Utah and was a deputy director of the Department of Corrections. She signed two of the grant applications Corrections submitted to CCJJ. By doing so, she attested to the truth and accuracy of the applications and agreed for herself and Corrections to comply with the grants' requirements.

17.     Defendant London Stromberg is an employee of the State of Utah and was the Deputy Executive Director of the Department of Corrections. He signed one of the grant applications that Corrections submitted to CCJJ. By doing so, he attested to the truth and accuracy of the application and agreed for himself and Corrections to comply with the grant's requirements.

18.     Defendant Mike Rapich is an employee of the State of Utah and Executive Director of the Department of Public Safety ("Public Safety"). He signed supplanting certifications submitted to CCJJ. By doing so, he attested to the truth and accuracy of the certifications and agreed for himself and Public Safety to comply and was in compliance with the

grants' requirements. As the Executive Director he was responsible for Public Safety's compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

19.     Defendant Dan Maldonado is an employee of the State of Utah and Executive Director of the Division of Juvenile Justice Services ("Division"). He signed grant applications the Division submitted to CCJJ. By doing so, he attested to the truth and accuracy of the applications and agreed for himself and the Division to comply with the grants' requirements. As the Executive Director he was responsible for the Division's compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

20.     Defendant Daniel Becker was an employee of the State of Utah and was the State Court Administrator. He signed grant applications the Administrative Office of the Courts ("Courts") submitted to CCJJ. By doing so, he attested to the truth and accuracy of the applications and agreed for himself and the Courts to comply with the grants' requirements. As the Administrator, he was responsible for the Court's compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

21.     Defendant Rhett McQuiston is an employee of the State of Utah and was the Supervisory Special Agent for the Office of the Utah Attorney General's Internet Crimes Against Children ("ICAC") Task Force. He signed supplanting certifications submitted to CCJJ. By doing so, he attested to the truth and accuracy of the certifications and agreed for himself and the Office of the Utah Attorney General to comply and was in compliance with the grants' requirements. As the Supervisory Special Agent, he was responsible for the ICAC Task Force's

compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

22.     Defendant Tom Darais is an employee of the State of Utah and was the Financial Manager for the Division of Juvenile and Justice Services ("Division"). He signed supplanting certifications submitted to CCJJ. By doing so, he attested to the truth and accuracy of the certifications and agreed for himself and the Division to comply and was in compliance with the grants' requirements. As the Financial Manager he was responsible for the Division's compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

23.     Defendant Jeffery Wilson is an employee of the State of Utah and was a correction captain for the Department of Corrections ("Corrections"). He signed grant applications Corrections submitted to CCJJ. By doing so, he attested to the truth and accuracy of the applications and agreed for himself and Corrections to comply with the grants' requirements. As a correction captain, he was responsible for Corrections' compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

24.     Defendant Mike Haddon, is an employee of the State of Utah and was the Deputy Director and currently is the Executive Director of the Department of Corrections ("Corrections"). He signed grant applications Corrections submitted to CCJJ and DOJ. By doing so, he attested to the truth and accuracy of the applications and agreed for himself and Corrections to comply with the grants' requirements. As the Deputy Director and Executive

7

Director, he was responsible for Corrections' compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

25.     Defendant Daniel Chesnut is an employee of the State of Utah and was a program manager at the Utah Department of Corrections ("Corrections"). He signed supplanting certifications submitted to CCJJ. By doing so, he attested to the truth and accuracy of the certifications and agreed for himself and Corrections to comply and was in compliance with the grants' requirements. As the Program Manager, he was responsible for Corrections' compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

26.     Defendant Kim Allard, is an employee of the State of Utah and of the Administrative Office of the Courts ("Courts"). She signed grant applications the Courts submitted to CCJJ and DOJ. She signed supplanting certifications submitted to CCJJ. By doing so, she attested to the truth and accuracy of the applications and agreed for herself and the Courts to comply with the grants' requirements. She was responsible for the Courts' compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

27.     Defendant Leo Lucey is an employee of the State of Utah and employee of the Office of the Attorney General ("Attorney General"). He signed grant applications the Attorney General submitted to CCJJ and DOJ. By doing so, he attested to the truth and accuracy of the applications and agreed for himself and the Attorney General to comply with the grants'

requirements. He was responsible for the Attorney General's compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

28.     Defendant Rich Townsend was an employee of the State of Utah and the Department of Public Safety ("Public Safety"). He signed grant applications Public Safety submitted to CCJJ and DOJ. By doing so, he attested to the truth and accuracy of the applications and agreed for himself and Public Safety to comply with the grants' requirements. He was responsible for Public Safety's compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

29.     Defendant Geri Miller is an employee of the State of Utah and Department of Corrections ("Corrections"). She signed grant applications Corrections submitted to CCJJ and DOJ. By doing so, she attested to the truth and accuracy of the applications and agreed for herself and Corrections to comply with the grants' requirements. She was responsible for Corrections' compliance with all grant requirements and for submitting and causing others to submit false claims to the United States.

30.     All defendants described and enumerated in paragraphs 12 through 29 are sued in their individual capacities and are referred to throughout this complaint as the "Individual Defendants." The Individual Defendants are being sued for violations of the False Claims Act (First, Second, and Third Causes of Action).

31.     Defendant State of Utah is a governmental entity with its capitol located in Salt Lake City, Utah. The State through its agencies and employees misused millions of dollars of grant money received from DOJ. Although it is responsible for submitting and causing others to

submit false claims to the United States, the State of Utah is being sued for violations of common

law fraud, unjust enrichment, negligent misrepresentation, payment by mistake, breach of

contract, and the covenant of good faith and fair dealing.

<u>THE FALSE CLAIMS ACT</u>

32.     The False Claims Act ("FCA") prohibits the submission of false claims,

statements, and records to the United States for payment.

33.     The FCA provides that any "person" who: "(A) knowingly presents, or causes to

be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or

causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

(C) conspires to commit a violation of [the statute,] . . . ;  is liable to the United States

Government for a civil penalty . . . plus 3 times the amount of damages which the Government

sustains because of the act of that person." 31 U.S.C. § 3729(a)(1)(A)-(C).

34.     The FCA defines the terms "knowing" and "knowingly" as follows:

(1) the terms "knowing" and "knowingly"

(A) mean that a person, with respect to information(i) has actual
knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the
information; or

(iii) acts in reckless disregard of the truth or falsity of the
information;

(B) require no proof of specific intent to defraud;

31 U.S.C. § 3729(b)(1).

35.     The FCA defines the term "claim" as:

> any request or demand, whether under a contract or otherwise, for
> money or property and whether or not the United States has title to the
> money or property, that (i) is presented to an officer, employee, or agent
> of the United States; or (ii) is made to a contractor, grantee, or other
> recipient, if the money or property is to be spent or used on the
> Government's behalf or to advance a Government program or interest,
> and if the United States Government (I) provides or has provided any
> portion of the money or property requested or demanded; or (II) will
> reimburse such contractor, grantee, or other recipient for any portion of
> the money or property which is requested or demanded.

31 U.S.C. § 3729(b)(2).

36.     A request for a grant payment submitted to DOJ is a claim under the FCA.

JAG-ARRA GRANT PROGRAM

37.     Starting in 2009, the United States, through DOJ's Office of Justice Programs, offered grants through the JAG-ARRA program to state and local law enforcement to preserve and create critical law enforcement jobs. *See* Pub. L. 111-5, § 2, 123 Stat. 130.

38.     The JAG-ARRA program requires, as a condition of receiving federal funds, that grant recipients comply with several requirements and restrictions on the use of grant money. Those requirements and restrictions serve the program's primary objective of restoring and creating jobs.

39.     Replacing state money with federal grant money, a practice known as supplanting, is a key restriction in many federal grants. Supplanting is one of the central restrictions DOJ placed on the use of federal grant money awarded through the JAG-ARRA program.

11

<u>EDWARD BYRNE MEMORIAL JUSTICE ASSISTANCE GRANT PROGRAM</u>

40.     The Edward Byrne Memorial Justice Assistance Grant Program, 42 U.S.C.

§ 3751, is the primary source of federal criminal justice funding to state and local jurisdictions.

41.     The Byrne Memorial JAG program requires, as a condition of receiving federal

funds, that grant recipients comply with several requirements and restrictions on the use of

federal grant money. Those requirements and restrictions serve the program's primary goal of

improving the efficiency and effectiveness of criminal justice systems.

42.     Byrne Memorial JAG grants also contain non-supplanting provisions. *See*  42

U.S.C. § 3752(1).

<u>INTERNET CRIMES AGAINST CHILDREN TASK FORCE PROGRAM</u>

43.     The Internet Crimes Against Children Task Force ("ICAC") program helps state

and local law enforcement agencies develop an effective response to technology-facilitated child

sexual exploitation and Internet crimes against children.

44.     DOJ's Office of Justice Programs originally created the ICAC program under the

authority of the 1998 Justice Appropriations Act, Pub. L. 105–119. The Providing Resources,

Officers, and Technology to Eradicate Cyber Threats to Our Children Act of 2008, (Pub. L. 110-

401, codified at 42 U.S.C. § 17601, et seq.), reauthorized the ICAC program and funding. The

ICAC program is a national network of 61 coordinated task forces representing over 4,500

federal, state, and local law enforcement and prosecutorial agencies.

45.     Unlike the JAG-ARRA and Byrne Memorial JAG programs, the ICAC Task

Force Program is not a competitive grant program. DOJ annually invites law enforcement

12

entities to apply for funding through DOJ's Office of Juvenile Justice and Delinquency

Prevention. DOJ sends a letter of invitation directly to an entity explaining how much money the

entity can receive. The ICAC program contains non-supplanting provisions by reference to and

incorporation of OJP's Financial Guide.

<u>THE NON-SUPPLANTING REQUIREMENT IN FEDERAL GRANTS</u>

46.     Importantly, and as Congress intended, the JAG-ARRA and Byrne Memorial JAG

grants, and the ICAC cooperative agreements Defendants applied for and received contained

non-supplanting provisions. The non-supplanting provision is one of the conspicuous, central

restrictions Congress and DOJ places on the use of federal grant money.

47.     Applicants for, and recipients of, federal grants are required by law to comply

with and certify compliance with the non-supplanting requirements as a condition of receiving

grants and payment of grant money.

48.     The failure to comply with all grant requirements may result in the suspension or

termination of funding or other sanctions.

49.     Once DOJ awards a grant, a grant recipient's obligation to comply with the non-

supplanting provisions does not stop. Grant recipients have an ongoing responsibility to comply

with the non-supplanting and other provisions of the grant and must routinely certify that they

are using federal money according to the grant's objectives and legal requirements.

50.     The JAG-ARRA program's non-supplanting requirement mandates that a

recipient may only use grant money to increase the recipient's law enforcement budget. A

recipient may not use federal grant money to reduce its budget by replacing state money it would have spent on the same activities absent the grant money.

51. DOJ's Office of Justice Programs' Financial Guide, a part of all DOJ's grant programs, explains:

**SUPPLANTING**

Federal funds must be used to supplement existing funds for program activities and must not replace those funds that have been appropriated for the same purpose. Supplanting will be the subject of application review, as well as preaward review, postaward monitoring, and audit. If there is a potential presence of supplanting, the applicant or grantee will be required to supply documentation demonstrating that the reduction in non-Federal resources occurred for reasons other than the receipt or expected receipt of Federal funds. For certain programs, a written certification may be requested by the awarding agency or recipient agency stating that Federal funds will not be used to supplant State or local funds.

52. The Financial Guide further defines supplanting as "deliberately reduc[ing] State or local funds because of the existence of Federal funds."

53. The Financial Guide also provides an example of supplanting: "[W]hen State funds are appropriated for a stated purpose and Federal funds are awarded for that same purpose, the State replaced its State funds with Federal funds, thereby reducing the total amount available for the stated purpose."

54. The application materials CCJJ created and provided state agencies to apply for JAG-ARRA subgrants contain several warnings about supplanting. First, grant money "cannot be used to replace or supplant any budget item that is currently approved for funding by your legislative body." Second, applicants must be "certain in [their] budget not to request [grant] funding to replace any positions or items that are already approved for funding in your current

14

budget." Finally, "[f]ederal funds must be used to supplement existing funds for program activities and not replace those funds that have been appropriated for the same purpose."

55.     ARRA-JAG grant applications also referred applicants to DOJ's supplanting regulations that are publicly accessible on OJP's website.

56.     A state government executive and grant manager must sign grant applications. By signing, applicants certify that all information in the application is true and correct and that the applicant will comply with and monitor compliance with all legal and administrative requirements and assurances that govern the acceptance and use of federal grant money, including, importantly, all non-supplanting requirements.

57.     In addition to assurances made in grant applications, grant recipients are also required to certify compliance as a precondition to payment of grant money. Pub. L. 111-5, § 2, 123 Stat. 287-88. This payment request certification consists of the submission of progress, performance measurement, and financial status reports.

58.     The progress report provides the status of the project and identifies any delays or other issues. It includes the number of jobs created, retained or restored. Grant recipients upload progress reports to OJP's Grants Management System.

59.     A Financial Status Report, and its successor Federal Financial Report, contains the actual costs a grant recipient incurred and any program revenue received.

60.     Each grant recipient on each Financial Status Report certifies the report is correct and complete and that "all outlays and unliquidated obligations are for the purposes set forth in the award documents." Starting in January 2010, recipients used the Federal Financial Report,

15

which requires recipients to certify the report is "true, complete, and accurate to the best of [that person's] knowledge." It also requires the recipient to certify that it is "aware that any false, fictitious, or fraudulent information may subject [her] to criminal, civil, or administrative penalties." DOJ's guidance to recipients advises that by clicking the "submit" button in the Grants Management System, a recipient is certifying that the report is true, complete, and accurate.

61.     Grant recipients must also submit requests for disbursements either by phone through DOJ's Phone Activated Paperless Request System or on-line through DOJ's Grants Payment Request System. Prior to January 2011, most recipients requested payments by phone. If made through the Grants Payment Request System, only an authorized specialist can request disbursement.

THE STATE OF UTAH APPLIED FOR AND<br>RECEIVED FEDERAL GRANTS

62.     DOJ awarded the State, through the Utah Commission on Criminal and Juvenile Justice ("CCJJ"), four grants from 2009 through 2011: 2009-SU-B9-0045, 2009-DJ-BX-0657, 2010-DJ-BX-0318, and 2011-DJ-BX-2082. DOJ also entered into three cooperative agreements with the Office of the Attorney General, all numbered 2009-MC-CX-KO53, for federal ICAC funding.

63.     When the State applied for these grants and the Individual Defendants signed these cooperative agreements, they represented and certified they would comply with the non-supplanting provisions of federal grant programs.

64. The Individual Defendants also represented and certified that the information in the applications were true and correct, they would comply with all assurances, and they would comply with any additional requirements prior to receiving any grant money.

65. CCJJ used the four grants it received to award multiple subgrants to various State agencies. It awarded eight subgrants to the Office of the Utah Attorney General, the Administrative Office of the Courts, the Department of Public Safety, Division of Juvenile Justice Services, and the Department of Corrections as follows:

| Grant | Subgrants | Amount | Grantee |
|---|---|---|---|
| **2009-SU-B9-0045** | | **$9,964,861** | **CCJJ** |
| | 9AR01 | $1,782,000 | Attorney General |
| | 9AR02 | $545,000 | Administrative Office of Courts |
| | 9AR03 | $453,861 | Department of Public Safety |
| | 9AR04 | $928,630 | Juvenile Justice Services |
| | 9AR05 | $958,422 | Department of Corrections |
| **2009-DJ-BX-0657** | | **$2,642,837** | **CCJJ** |
| | 9A21 | | Department of Corrections |
| **2010-DJ-BX-0318** | | **$2,541,633** | **CCJJ** |
| | 10A27 | | Department of Corrections |
| **2011-DJ-BX-2082** | | **$2,096,024** | **CCJJ** |
| | 11A27 | | Department of Corrections |

66. All agencies that received subgrants certified that the information contained in the subgrant applications was correct, met all grant requirements, and that they would comply with all provisions of the program, including OJP's Financial Guide.

67. CCJJ served as the administrative agency for all eight subgrants. As the administrative agency, CCJJ oversaw the distribution of grant money and agency spending according to the grants' objectives. CCJJ also submitted to DOJ financial reports, program

17

reports, performance measurement data, and subgrant information. Finally, and perhaps most importantly, CCJJ agreed to monitor the agencies compliance with all of the grants' special conditions and provisions, including, importantly, the non-supplanting provisions.

68.     The four grants the State applied for and received (Nos. 2009-SU-B9-0045, 2009-DJ-BX-0657, 2010-DJ-BX-0318, and 2011-DJ-BX-2082), and the three ICAC cooperative agreements it signed (No. 2009-MC-CX-K053) expressly prohibited supplanting.

69.     The State, its agencies, and the Individual Defendants also knew that compliance with federal grant requirements was material to the United States' decision to award grant money, was central to the United States' grant programs, and was a condition of the grant awards and payments.

70.     As examples of materiality of the non-supplanting provision to federal grant programs, DOJ has terminated or taken other action against grant recipients, including state and local governments, for not complying with grant requirements:

A.     In 2009, the DOJ barred 25 state and local law enforcement agencies from receiving DOJ grants for violating the non-supplanting requirements.

B.     The DOJ has litigated or settled actions where it alleged that grant awardees supplanted or did not comply with grant requirements. *See, e.g., Former Grant Administrator and Legal Assistant of American Samoa Non-profit Legal Aid Corporation Sentenced for Stealing Nearly $160,000 in Federal Grant Funds,* https://www.justice.gov/opa/pr/former-grant-administrator-and-legal-assistant-american-samoa-non-profit-legal-aid-0.

71.     DOJ would have taken affirmative action earlier had it known the Defendants were violating the non-supplanting provisions.

### INDIVIDUAL DEFENDANTS SUBMITTED FALSE CERTIFICATIONS TO OBTAIN GRANT MONEY AND RECEIVE PAYMENT

72.     The Individual Defendants knowingly submitted false and fraudulent assurances and certifications to obtain grants.

73.     The Individual Defendants knowingly assured DOJ, when they submitted and signed grant applications and award documents, that they were aware of the non-supplanting provisions and would follow the provisions.

74.     The Individual Defendants' assurances and certifications were false. Instead of complying with the grants' provisions, Defendants supplanted in express violation of the grants' terms.

75.     The Individual Defendants also certified, falsely, in each payment request that the request was not fraudulent and that they and the State were using the grant money for the objectives as stated in the grant award documents.

76.     The Defendant's failure to comply with Congressional rules established as preconditions for the grant award disqualified the State from receiving federal money.

77.     In addition to these false assurances and certifications, CCJJ failed to properly monitor State agencies compliance with the non-supplanting provisions and other grant requirements.

78.     CCJJ and employees Ronald Gordon and Richard Ziebarth, knew or should have known, from emails, requests for payment, and the reports agencies submitted that the agencies

were improperly supplanting and were not fully in compliance with the grants' requirements. In particular, they knew, or should have known, the agencies were moving existing employees into grant-funded positions but not immediately filling the vacated positions with new hires; or that the agencies were using grant funds to pay current employee salaries while misrepresenting that these positions would be, or were, eliminated in budget cuts.

79.    Even though CCJJ and its employees knew, or should have known, about supplanting, it failed to correct the violations and continued, rather, to certify compliance with the non-supplanting requirement in each Financial Status Report and Federal Financial Report it submitted to DOJ.

80.    Like CCJJ, the Office of the Attorney General including its employees Kirk Torgenson, Rhett McQuiston, and Leo Lucey knew, or should have known, through emails, requests for payment, and reports it submitted to DOJ that it was improperly supplanting. In particular, the Office of the Attorney General moved existing employees into grant-funded positions but did not immediately fill the vacated positions with new hires; or it used grant funds to pay existing employee salaries while misrepresenting that the employees' positions would be, or were, eliminated by budget cuts.

81.    Even though the Individual Defendants knew or should have known their agencies and the State was in violation, they certified to DOJ that they, their agencies, and the State were complaint to obtain the following grants and continue to receive payments of federal money.

20

### GRANT 2009-SU-B9-0045
### Utah Commission on Criminal and Juvenile Justice

82.     CCJJ applied for and received $9,964,861 to partly fund five "quickstart" projects through subgrants to five state agencies: 1) the Utah Attorney General's Office (subgrant 9AR01); 2) the Administrative Office of the Courts (subgrant 9AR02); 3) the Department of Public Safety (subgrant 9AR03); 4) the Division of Juvenile Justice Services (subgrant 9AR04); and 5) the Department of Corrections (subgrant 9AR05). CCJJ represented that grant money would create, retain, or restore 45 jobs.

83.     The stated grant period was March 31, 2009 to June 30, 2013.

84.     Individual Defendant Ronald Gordon, the Executive Director of CCJJ, signed the application and certified that CCJJ was aware of and would not violate the grant's non-supplanting requirements. Individual Defendant Richard Zebarth, CCJJ's grant manager, wrote the application and caused CCJJ to submit it on behalf of the State to DOJ.

85.     CCJJ expressly notified state agencies of the supplanting provision by including the following warning in the non-supplanting certification it created and provided to state agencies:

> **Supplanting** - *JAG - ARRA stimulus funding cannot be used to replace or supplant any budget item that is currently approved for funding by your legislative body. Be certain in your budget not to request JAG funding to replace any positions or items that are already approved for funding in your current budget. See USDOJ supplanting regulations:* http://www.ojp.usdoj.gov/recovery/supplantingguidance.htm

86.     CCJJ also expressly described for the agencies in its certification how to comply with the non-supplanting provisions:

21

**Utah JAG - ARRA positions funded from the grant are allowable under the following scenarios:**

**1) Create a New Position with JAG - ARRA Funding -** In this scenario JAG - ARRA funding is used to hire a person to fill a position approved in the agency JAG grant awarded by CCJJ. In a created position a new hire is added to the existing staff of the agency, paid from the JAG grant and the position is limited to working on approved project purposes (i.e. the agency is allowed to bill the grant only for those hours and purposes approved in the grant). It is advisable that the hiring agency establish the grant funded position as time limited since the JAG - ARRA award is one-time funding and will not be continued by CCJJ. This new position should add to the existing staff and not merely transfer the cost of an existing position from the agency to the JAG-ARRA grant.

**2) Retaining a Position Lost Due to Budget Cuts** - JAG - ARRA grant funding can used to maintain a staff position within the grant awarded agency that would otherwise have been lost due to budget cuts. Having a position that "might" be lost is not allowable. The agency must be able to produce proof in their budget and or other verifiable legislation that would indicate that this position was terminated due to budget cuts. When an employee is retained with JAG - ARRA funding that employee will need to work only on the approved grant funded purposes. If an agency was awarded JAG - ARRA funding and is paying salary for a position that ended up not being cut from the agency budget then the supplanting is occurring. In this case the agency will have to immediately back-fill the old position (as in item 3 below) or terminate the grant and return any JAG funding to CCJJ that was used to pay salary.

**3) Use an Existing Employee to Fill a JAG - ARRA Funded Position and Back-fill the Old Position** - It is okay for an agency to pay the salary of an existing employee with JAG - ARRA grant funding, but that position must be working only on the approved purposes of the grant. Additionally, the position that the existing employee vacated to take the JAG - ARRA position will need to be back-filled immediately with an agency funded (time limited) new hire in order to avoid supplanting. No grant funding should be used to pay the salary of an existing employee until the back-fill position is hired and being paid from agency funds. If the agency in this situation fails to hire the back-fill position for the vacated position it is supplanting and the JAG grant may need to be terminated by CCJJ or the back-fill position immediately hired before grants funds are used to pay any salary.

87.     Each agency executive or grant manager, including the Individual Defendants, signed the CCJJ non-supplanting certification acknowledging that he or she understood the non-supplanting provisions and agreed to comply.

88.     Beginning on June 18, 2009, and ending on May 16, 2013, CCJJ, or the agencies that received subgrants, requested 17 disbursements from this grant. In connection with each request, CCJJ submitted a Financial Status Report or Federal Financial Report. A CCJJ financial manager submitted these requests.

89.     Although the certification language in the reports changed over time, CCJJ in each disbursement request certified the report was truthful, correct, complete, did not contain fraudulent information and the money was or would be used for the purposes explained in the grant award documents. By doing this, CCJJ certified that it complied with the grant requirements, including the non-supplanting provisions.

90.     CCJJ, the State and its other agencies and the Individual Defendants, knew, or should have known, however, they had not complied and would not comply with the non-supplanting provisions when they submitted claims for disbursement. This resulted in the State and its agencies, including CCJJ, and the Individual Defendants committing fraud by submitting or causing them to submit false claims for payment to DOJ in violation of the FCA.

### *Subgrant 9AR01*
### *Attorney General's Office*

91.     The Attorney General's Office ("Attorney General") received $1,782,000 to form the Statewide Enforcement of Crimes by Undocumented Residents Task Force. It stated it would use the grant money to preserve the existing jobs of three full-time employees and to hire three new full-time employees who would be entirely and exclusively dedicated to task force activities.

92.     Kirk Torgensen, the Chief Criminal Deputy at the Attorney General's Office, and Leo Lucey, Assistant Section Chief, signed the application and certified that the Attorney General was aware of and would not violate the grant's non-supplanting requirements.

93.     Rhett McQuiston, Supervisory Special Agent, signed the CCJJ supplanting certification.

23

94.     The Attorney General identified Leo Lucey and Cord Skinner as two employees whose positions it retained using grant money.

95.     Shortly after the Attorney General received the subgrant, however, it transferred Lucey and Skinner to other positions within the office. It then transferred employees who were already working in the office to vacated positions and never filled the transferred employees' positions.

96.     The Attorney General supplanted by transferring Lucey and Skinner and then filling their vacated positions with existing employees. By doing so, it wrongfully replaced money in its budget with federal grant money.

97.     The Attorney General admitted its wrongdoing in a response to a records request on December 3, 2015:

> 1.     In your records request, you ask for records regarding reductions in force of the positions of two named persons. You ask for records identifying employees that backfilled positions vacated by certain employees. Finally, you ask for records regarding backfilling positions vacated by certain persons. Your request, therefore, is based on the premise that there were RIF's (reductions in force) and that positions were backfilled to fill vacancies. Your premise is incorrect, however. There were no such reductions in force and no such backfilling to fill vacancies. Since you are asking for records of something that did not happen, there are no records responsive to your request.

### *Subgrant 9AR02*
### *Administrative Office of the Courts*

98.     The Administrative Office of the Courts received $545,000 to retain or rehire several clerical positions.

99.     Daniel Becker, Court Administrator, and Kim Allard, Program Manager, signed

the application and certified that the Courts was aware of and would not violate the grant's non-

supplanting requirements.

100.    Kim Allard signed the CCJJ supplanting certification.

101.    The clerical positions Courts claimed it would lose without federal grant money

were actually vacant positions it did not fill because of attrition and a hiring freeze. Courts hired

only one person for approximately 6 months, and otherwise used the grant money to pay existing

employee salaries.

102.    Courts paid existing employees Mandi Rohrer, Lisa Pickering, Jackie Taylor,

Lacie Downs, Brady Petersen, Ashlee Wilson, Jay Mills, Earline Matheson and Lorene Childs

and possibly others with federal grant money and did not fill any of the positions it claimed it

would lose.

103.    Courts used federal grant money to fund clerk positions it knew it would not lose

through budget cuts. By doing so, it wrongfully replaced money in its budget with federal grant

money.

### *Subgrant 9AR03*
### *Department of Public Safety*

104.    The Department of Public Safety ("Public Safety") received $453,861 to retain

two computer forensic examiners and one ICAC Task Force investigator. Public Safety claimed

that without federal grant money it would lose these positions because of budget cuts.

105.    Rich Townsend, the Deputy Commissioner and Mike Rapich signed the application and certified that Public Safety was aware of and would not violate the grant's non-supplanting requirements.

106.    Mike Rapich signed the CCJJ supplanting certification.

107.    Public Safety moved existing employees Steve Gamvroulas, Terry Sparks, Daniel Hooper and possibly others to grant-funded positions and then did not fill the vacated positions.

108.    Public Safety used federal grant money to fund positions it knew it would not lose to budget cuts. By doing so, it improperly replaced money in its budget with federal grant money.

### *Subgrant 9AR04*
### *Division of Juvenile Justice Services*

109.    The Utah Division of Juvenile Justice Services ("Division") received $928,630 to restore 13 positions it claimed it eliminated because of budget cuts.

110.     Dan Maldonado, Division Director, and Tom Darais, Federal Revenue Manager, signed the application and certified that the Division was aware of and would not violate the grant's non-supplanting requirements.

111.    Tom Darais signed the CCJJ supplanting certification.

112.    The Division did not eliminate any positions. Rather it transferred 11 employees it claimed to have terminated because of budget cuts to other positions within the Division and did not fill the vacated positions. The other two positions were vacant positions.

113.    The Division improperly used federal grant money to fund these positions because it knew it would not lose the positions to budget cuts. In fact, the Utah Legislature

reinstated "on going funding" for two of the positions during the time the Division was receiving federal grant money to pay the salaries of these same two positions. By doing so, it wrongfully replaced budgeted money with federal grant money.

### *Subgrant 9AR05*
### *Department of Corrections*

114.     The Department of Corrections ("Corrections") received $958,422 to hire 6 new Offender Employment Coordinators for the Employment Placement Program.

115.     Robyn Williams, Deputy Director and Geri Miller signed the application and certified that Corrections was aware of and would not violate the grant's non-supplanting requirements.

116.     Daniel Chesnut signed the CCJJ supplanting certification.

117.     Rather than hire new employees, Corrections used federal grant money to pay the salaries of existing employees T. Cottrel, J. Williams, J. Wifaon, C. Gunderson, T. Cressall, E. Price, and possibly others.

118.     Corrections did not immediately fill the vacated positions with new hires and one position was never filled.

119.     By doing so, Corrections wrongfully replaced budgeted money with federal grant money.

27

### Grant 2010-DJ-BX-0318
### Commission on Criminal and Juvenile Justice

120.    CCJJ received $2,541,633, of which it awarded $773,472 through a subgrant (10A27) to the Department of Corrections ("Corrections") to continue the Employment Placement Program and retain the positions funded under subgrant 9AR05.

121.    The stated grant period was September 30, 2011 to June 30, 2013.

122.    Ronald Gordon, Executive Director of CCJJ and Richard Ziebarth, Grant Program Manager, signed the application and certified that CCJJ was aware of and would not violate the grant's non-supplanting requirements.

123.    Robyn Williams, Deputy Executive Director and Jeffery Wilson, Supervisor, signed the CCJJ application and certified that Corrections was aware of and would not violate the grant's non-supplanting requirements. Jeffery Wilson signed the CCJJ non-supplanting certification.

124.    CCJJ knew this grant and grants 2011-DJ-BX-2082 and 2009-DJBX-0657 prohibited supplanting because it notified the agencies of the non-supplanting provisions. Each agency's executive or program manager signed the application documents for a subaward and agreed to the following provision:

**(APPENDIX 1)**
**CERTIFIED ASSURANCES & GRANT CONDITIONS**
**Utah Justice Assistance Grant Program**

1.  The applicant assures that grant funds awarded under the Justice Assistance Grant program (JAG), authorized by Congress and administered by the U.S. Department of Justice - Bureau of Justice Assistance (BJA) **will not supplant State or local funds.** Federal funds must be used to supplement existing funds for program activities and not replace those funds that have been appropriated for the same purpose.

28

125.    Corrections used the grant money to pay existing employee salaries. Corrections transferred the employees paid under subgrant 9AR05 to this subgrant.

126.    Corrections did not immediately fill the vacated positions from 9AR05 with new hires. Rather funding for the positions continued to this grant.

127.    Beginning on August 17, 2010, and ending on November 12, 2013, CCJJ requested 16 disbursements from this grant. In connection with each request, CCJJ submitted a Financial Status Report or Federal Financial Report. A CCJJ financial manager submitted these disbursement requests.

128.    In each disbursement request, CCJJ certified the report was true, complete, and accurate and that any false, fictitious, or fraudulent information would subject the person and entity submitting the report to criminal, civil, or administrative penalties. By submitting the request for disbursement, CCJJ certified that it complied with the grant's requirements, including the non-supplanting provisions.

129.    CCJJ, Ron Gordon, Richard Ziebarth and other Individual defendants knew, or should have known, when it requested and submitted claims for disbursement of federal grant money that they and Corrections had violated the non-supplanting provisions of the grant. Corrections as a result caused CCJJ to submit false claims for payment to the DOJ in violation of the FCA.

### Grant 2011-DJ-BX-2082
### Commission on Criminal and Juvenile Justice

130.    CCJJ received $2,096,024 to fund state and local governments and private providers of criminal justice services.

131.     Ronald Gordon, Executive Director of CCJJ, and Richard Ziebarth, Grant Manager, signed the application and certified that CCJJ was aware of and would not violate the grant's non-supplanting requirements.

132.     One funding priority CCJJ identified in its grant program narrative was continuation of the Department of Corrections ("Corrections") Employment Placement Project, a program to assist incarcerated individuals with transition and re-entry into the community and post-incarceration employment.

133.     Corrections initially received $958,442 under subgrant 9AR05 and then an additional $773,472 under subgrant 10A27 for the Employment Placement Project.

134.     Corrections then received $650,000 for the continuation of the Employment Placement Project under subgrant 11A27, with almost all of the money budgeted to pay the salaries of the offender employment coordinators and agents.

135.     Corrections used federal grant money to pay existing employee salaries. Corrections transferred the employees it paid under subgrant 10A27 to subgrant 11A27. Corrections did not immediately fill the vacated positions from grant 9AR05 that continued to grant 11A27.

136.     By doing so, it wrongfully replaced budgeted money with federal grant money.

137.     Jeffery Wilson and London Stromberg signed the application for grant 11A27 and certified that Corrections was aware of and would not violate the grant's requirements.

138.     Corrections also billed the United States twice for several Employment Placement Program agents' salaries because the grant periods when the salaries were paid overlapped the subgrant awards.

139.     Despite knowing of the double billing, Corrections did nothing to report it to CCJJ or DOJ and never attempted to repay DOJ.

140.     From August 31, 2011, through November 26, 2014, CCJJ requested 16 disbursements from this grant. In connection with each request, CCJJ submitted a Financial Status Report or Federal Financial Report. A CCJJ financial manager submitted these disbursement requests.

141.     In each disbursement request, CCJJ, through its director and employees, expressly certified the report was true, complete, and accurate and that any false, fictitious, or fraudulent information would subject the person and entity submitting the report to criminal, civil, or administrative penalties. By so certifying, CCJJ certified that it and Corrections complied with the grant's requirements, including the applicable non-supplanting provisions.

142.     CCJJ, Ronald Gordon, Richard Ziebarth and other Individual Defendants knew, or should have known, when it requested disbursements and submitted claims for federal grant money that it and Corrections violated the non-supplanting provisions of the grant. Corrections caused CCJJ, Ronald Gordon and Richard Ziebarth to submit false claims for payment to DOJ in violation of the FCA.

### Grant 2009-DJBX-0657
### Commission on Criminal and Juvenile Justice

143.    CCJJ received $2,642,837, to enhance statewide public services and support statewide narcotics interdiction and prevention services. CCJJ awarded several subgrants to state agencies from this grant, including one to the Department of Corrections ("Corrections").

144.    Ronald Gordon, the Executive Director of CCJJ signed the application and certified that CCJJ was aware of and would not violate the grant's non-supplanting requirements. Richard Zebarth, CCJJ's grant manager, wrote the application and submitted or caused the State to submit the application to DOJ.

145.    From August 20, 2009, through January 30, 2013, CCJJ requested 17 disbursements from this grant. In connection with each request, CCJJ submitted a Federal Financial Report or Financial Status Report. A CCJJ financial manager submitted these disbursement requests.

146.    In each disbursement request, CCJJ, through its director and employees, certified the report was true, complete, and accurate and that any false, fictitious, or fraudulent information would subject the person and entity submitting the report to criminal, civil, or administrative penalties. By doing so, CCJJ certified that it complied with the grant's requirements, including the non-supplanting provisions.

147.    CCJJ, Corrections, Ronald Gordon, Richard Ziebarth, and other Individual Defendants knew, or should have known, when they requested and submitted claims for disbursement that they violated the non-supplanting provisions of the grant. Corrections as a

result caused CCJJ, Ronald Gordon and Richard Ziebarth to submit false claims for payment to the DOJ in violation of the FCA.

### *Subgrant 9A21*
### *Department of Corrections*

148.    The Department of Corrections ("Corrections") received $29,775 for moral reconation therapy training and later received $37,389 to pay the salaries of six part-time scanning technicians.

149.    Corrections submitted a grant adjustment request to CCJJ and requested to use remaining funds from this grant to pay salaries of scanning technicians. Corrections claimed it funded the scanning positions with another grant that it had depleted.

150.    Tom Patterson, Executive Director, and Mike Haddon, Deputy Director signed the application and certified that the Corrections was aware of and would not violate the grant's non-supplanting requirements.

151.    Corrections stated in a grant adjustment request that it had used all available funding from other DOJ grants to pay the scanning technician salaries.

152.    Corrections improperly used federal grant money to train staff on the moral reconation training program when it already had a contract with Correctional Counseling, Inc., to provide the training. The contract with Correctional Counseling, Inc., was effective from October 15, 2009, through October 14, 2012.

*Cooperative Agreement 2009-MC-CX-K053*
*Utah Attorney General's Office*

153.    The Office of the Attorney General ("Attorney General") received three separate awards for continuation of its ICAC Task Force. It received $268,806 in 2009, $263,316 in 2010 and $271,874 in 2011.

154.    Kirk Torgensen signed the award documentation and was the authorized representative. The Attorney General listed Jessica Farnsworth as the point of contact on all reports the Attorney General uploaded to DOJ's grants management system.

155.     DOJ, in connection with these awards, required recipients to establish and maintain adequate accounting systems and financial records that accurately account for grant money.

156.    The Attorney General used this grant money to pay agent salaries and failed to accurately track and charge the agents' time.

157.    DOJ also believes the Attorney General supplanted, although supplanting is difficult to verify because of the Attorney General's inadequate and inaccurate accounting.

158.    The Attorney General's Office knew of the award's prohibition of supplanting because the award documentation required the following:

*SPECIAL CONDITIONS*

 1.  The recipient agrees to comply with the financial and administrative requirements set forth in the current edition of the Office of Justice Programs (OJP) Financial Guide.

34

159.     From November 5, 2009, through January 10, 2013, the Attorney General requested 14 disbursements from this grant. The Attorney General made each request through DOJ's Phone Activated Paperless Request System or Grant Payment Request System.

160.     In each disbursement request, the Attorney General's authorized user and person submitting the requests certified the report was true, complete, and accurate and that any false, fictitious, or fraudulent information would subject the person submitting the request to criminal, civil, or administrative penalties. By submitting the requests for disbursement, the Attorney General, Kirk Torgensen, Leo Lucey, Rhett McQuiston, and other Individual Defendants certified they and the Attorney General complied with the grant's requirements, including the non-supplanting provisions.

<u>DEFENDANTS' MISREPRESENTATIONS</u>

161.     Defendants made materially false representations to obtain federal grant money. Among those materially false representations, Defendants represented that state agencies lost jobs or would lose jobs to budget cuts.

162.     In each instance, the agency that represented it did or would lose jobs had a budget surplus or had cuts restored before federal grants expired.

163.     CCJJ, Ronald Gordon, Richard Ziebarth, and other Individual Defendants misrepresented, for example, that the State would create, retain, or restore 45 jobs with grant money.

164.     The State did not create, retain, or restore 45 jobs using grant money because it was not immediately filling positions vacated by employees it moved to grant-funded positions.

35

165.     Public Safety misrepresented, for example, that it needed grant money to create, retain, or restore positions it lost or would lose because of budget cuts.

166.     The reality is the Utah Legislature appropriated to Public Safety so much money that Public Safety had millions of dollars in budget surpluses and had enough money to pay the salaries of all employees it paid with federal grant money. From 2009 to 2011 Public Safety had an average budget surplus of $27 million.

167.     The Division of Juvenile Justice Services ("Division"), Dan Maldonado, and other Individual Defendants misrepresented, for example, that the Division needed federal grant money to create, retain, or restore 13 positions.

168.     The reality is the Utah Legislature appropriated to the Division enough money to that pay the salaries of all employees it paid with federal grant money. From 2009 through 2010 the Division had an average budget surplus of $1 million.

169.     The Utah Legislative Auditor General confirmed these and other misrepresentations in audits it conducted of the Department of Corrections.

170.     In an audit conducted in 2013, for example, the Legislative Auditor General concluded that the Department of Correction's elimination of jobs led to a large surplus. The audit concluded that Corrections, from fiscal years 2008 to 2011, added about $10 million to its carry-forward funds, reaching a balance of $19.6 million. In fiscal year 2012, Corrections added another $5.6 million for a year-end carry-forward balance of $25.2 million.

171.     During this time, the Executive Director of Corrections Tom Patterson testified before the Utah Legislature that further budget cuts would force it to reduce employees and

release inmates from prison early. The Director specifically testified that a three percent cut, or $6.9 million, would result in the early release of 384 inmates and loss of approximately 75 staff positions.

172.    The Auditor also concluded that Corrections provided career ladder salary increases to over 500 employees using funds accumulated from vacant positions. Corrections left some of these positions vacant and did not immediately fill them when it moved existing employees to grant-funded positions.

173.    The State and its agencies also have claimed that they did not immediately fill vacated positions because of a state-wide hiring freeze. *See* Executive Order 2009-05-EO: *Implementing a Statewide Budget Reduction through June 30, 2010*. Regardless, a hiring freeze provides Defendants no legal justification to supplant and violate the agreements they made with DOJ.

174.    Defendants knowingly submitted false claims when they certified they had complied with: (1) the federal statutory non-supplanting mandate that grant funds not be used to replace state or local "funds that would, in the absence of federal funds, be made available for law enforcement activities," (42 U.S.C. § 3752(1)); (2) the statutory requirement that "all the information contained in the [grant] application is correct" (Id. § 3752 (5)(B)); and (3) the requirements to spend grant funds only for purposes and activities covered by approved project activities and budget.

175.    In the end, the State of Utah obtained millions of dollars in federal funds that it was not entitled to receive because of fraud and false certifications.

**FIRST CAUSE OF ACTION**
**False Claims Act: Presentation of False Claims**
**31 U.S.C. § 3729(a)(1)(A)**
**Individual Defendants**

176.    The United States repeats and realleges each allegation in ¶¶ 1 through 175 as if fully set forth herein.

177.    The Individual Defendants acting knowingly presented or caused to be presented false or fraudulent claims for payment to the United States.

178.    By virtue of the false or fraudulent claims made by the Individual Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, plus a civil penalty of $22,363 for each violation.

**SECOND CAUSE OF ACTION**
**False Claims Act: Making or Using False Record or Statement**
**31 U.S.C. § 3729 (a)(1)(B)**
**Individual Defendants**

179.    The United States repeats and realleges each allegation in ¶¶ 1 through 178, as if fully set forth herein.

180.    The Individual Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States.

181.    By virtue of the false records or statements made by the Individual Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act plus a civil penalty of $22,363 for each violation.

## THIRD CAUSE OF ACTION
### False Claims Act: Reverse False Claims
### 31 U.S.C. § 3729(a)(1)(D)
### Individual Defendants

182.     The United States repeats and realleges each allegation in ¶¶ 1 through 181, as if fully set forth herein.

183.     The Individual Defendants knowingly made, used or caused to be made or used a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the United States.

184.     By virtue of the false records or statements made by the Individual Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act plus a civil penalty of $22,363 for each violation.

## FOURTH CAUSE OF ACTION
### Common Law Fraud
### State of Utah

185.     The United States repeats and realleges each allegation in ¶¶ 1 through 184, as if fully set forth herein.

186.     The United States asserts claims for common law fraud against the State.

187.     The State through its employees made false claims regarding the use of federal grant money. These false claims were misrepresentations of material fact, were made with knowledge of their falsity and/or with reckless disregard for their truth, and with the intent that they be relied upon by the United States.

188.     The United States had the right to rely upon these representations. Acting without knowledge of the falsity of these representations and in reliance upon the State's and its

39

employees' misrepresentations, the United States paid these false claims and has been damaged in an amount to be determined.

## FIFTH CAUSE OF ACTION
### Payment Under Mistake of Fact
### State of Utah

189.    The United States repeats and realleges each allegation in ¶¶ 1 through 188, as if fully set forth herein.

190.    The United States asserts claims for common law payment under mistake of fact against the State.

191.    The United States paid or reimbursed the State under a mistake of fact that the State and its employees had accurately represented the State's proper use of federal grant money and in compliance with the grants' conditions. The State, however, took this money with notice of the payment the United States made under a mistake of fact.

192.    Had the true facts been known, the United States would not have paid the claims the State presented for payment.

193.    By reason of its payments, the United States has been damaged in an amount to be determined.

## SIXTH CAUSE OF ACTION
### Unjust Enrichment
### State of Utah

194.    The United States repeats and realleges each allegation in ¶¶ 1 through 193, as if fully set forth herein.

195.     The United States asserts claims for common law unjust enrichment against the

State.

196.     The State was unjustly enriched by the United States' disbursement of grant

money. The United States conferred a benefit on the State, the State appreciated and had

knowledge of the benefit, and the State accepted the benefit under circumstances described in

this Complaint that make it inequitable for the State to retain the benefit without repaying the

United States. The State of Utah took this money with notice that it was being unjustly enriched.

197.     By reason of the United States' payments which were paid solely as a result of

Defendants' failure to reflect truthfully how grant money was being spent, the State received

money to which it was not entitled and has been unjustly enriched in an amount to be

determined.

**SEVENTH CAUSE OF ACTION**
**Negligent Misrepresentation**
**State of Utah**

198.     The United States repeats and realleges each allegation in ¶¶ 1 through 197, as if

fully set forth herein.

199.     The United States asserts claims for common law negligent misrepresentation

against the State.

200.     In the course of its business, the State and its employees made false

representations to the United States. The State and its employees had a pecuniary interest in

making the statements and owed a duty of care to see that they communicated truthful

information to the United States. The State and its employees failed to exercise reasonable care

41

or competence in communicating the information to the United States and breached the duty of care owed to the United States by failing to exercise due care.

201.    The United States justifiably relied on the States' and its employees' representations.

202.    The United States suffered a pecuniary loss as the proximate result of reliance upon the misrepresentations in an amount to be determined.

**EIGHTH CAUSE OF ACTION**
**Breach of Contract**
**State of Utah**

203.    The United States repeats and realleges each allegation in ¶¶ 1 through 202, as if fully set forth herein.

204.    The United States asserts claims that the State breached its contract with the United States.

205.    The State through its employees by signing and submitting grant applications, grant award documents, and other assurance and certifications entered into valid, binding contracts with the United States.

206.    The State contracted to comply with all provisions of the grants it applied for, including the non-supplanting provisions.

207.    The United States performed or was excused from performing under the contracts.

208.    The State materially breached its contacts with the United States by not complying with grant requirements, including the non-supplanting provisions, as described in this Complaint.

42

209.    The United States suffered a pecuniary loss as result of the State's breach in an amount to be determined.

## NINTH CAUSE OF ACTION
### Breach of Covenant of Good Faith and Fair Dealing
### State of Utah

210.    The United States repeats and realleges each allegation in ¶¶ 1 through 209, as if fully set forth herein.

211.    The United States asserts claims for breach of the covenant of good faith and fair dealing against the State.

212.    Implied in every contract is a covenant of good faith and fair dealing.

213.    The United States and the State entered into valid, binding contracts.

214.    The State owed the United States a duty of good faith and fair dealing.

215.    The State breached its duty of good faith and fair dealing by failing to comply with grant requirements, including non-supplanting provisions, as described in this Complaint.

216.    The United States suffered a pecuniary loss as result of the State's breach in an amount to be determined.

WHEREFORE, the United States demands judgment as follows:

A.    On Count One, False Claims Act, judgment against the Individual Defendants, for treble its damages, for the number of civil penalties allowable by law, in an amount as the Court may determine between $11,181 and $22,363 for each violation, plus such other relief as the jury deems appropriate and just;

B.    On Count Two, False Claims Act, judgment against the Individual Defendants, for treble its damages, for the number of civil penalties allowable by law, in an amount as the Court may determine between $11,181 and $22,363 for each violation, plus such other relief as the jury deems appropriate and just;

C.    On Count Three, False Claims Act, judgment against the Individual Defendants, for treble its damages, for the number of civil penalties allowable by law, in an amount as the Court may determine between $11,181 and $22,363 for each violation, plus such other relief as the jury deems appropriate and just; and

D.    On Count Four, Common Law Fraud, judgment against the State for (a) damages in an amount to be determined, costs and interest; (b) a judgment declaring that the money is rightfully the property of the United States, and that the State holds money in trust for the use and benefit of the United States, and/or (c) a judgment that the United States holds an equitable lien with respect to that money;

E.    On Count Five, Payment Under Mistake of Fact, judgment against the State for the amount (a) of money of which the United States mistakenly paid to the State, plus pre-judgment interest, fees and costs, and/or (b) a judgment declaring that the money is rightfully the property of the United States, and that the State holds the money in trust for the use and benefit of the United States, and/or (c) a judgment that the United States holds an equitable lien with respect to the money;

F.    On Count Six, Unjust Enrichment, judgment against the State for (a) the amount the State of Utah was unjustly enriched, plus pre-judgment interest, fees and costs, and/or (b) a

judgment declaring that the money is rightfully the property of the United States, and that the State holds the money in trust for the use and benefit of the United States, and/or (c) a judgment that the United States holds an equitable lien with respect to the money;

G.     On Count Seven, Negligent Misrepresentation, judgment against the State for (a) damages in an amount to be determined, together with costs and interest; (b) a judgment declaring that the money is rightfully the property of the United States, and that the State holds the money in trust for the use and benefit of the United States, and/or (c) a judgment that the United States holds an equitable lien with respect to the money;

H.     On Count Eight, Breach of Contract, judgment against the State for (a) damages in an amount to be determined, together with costs and interest; (b) a judgment declaring that the money is rightfully the property of the United States, and that the State holds the money in trust for the use and benefit of the United States, and/or (c) a judgment that the United States holds an equitable lien with respect to the money;

I.     On Count Nine, Breach of Covenant of Good Faith and Fair Dealing, judgment against the State for (a) damages in an amount to be determined, together with costs and interest; (b) a judgment declaring that the money is rightfully the property of the United States, and that the State holds they money in trust for the use and benefit of the United States, and/or (c) a judgment that the United States holds an equitable lien with respect to the money.

J.     And for all other and further relief as the Court may deem just and equitable.

K.     For pre-judgment interest, post-judgment interest, fees, and costs, as the jury deems appropriate and just.

Respectfully submitted this 24th day of September 2021

Andrea T. Martinez
Acting United States Attorney
District of Utah

*/s/ Joel A. Ferre*

SANDRA L. STEINVOORT
JOEL A. FERRE
Assistant United States Attorneys
District of Utah