# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* REGINALD WILLIAMS,<br><br>Plaintiff,<br><br>v.<br><br>ROBYN WILLIAMS, RONALD GORDON, RICHARD ZIEBARTH, KIRK TORGENSEN, THOMAS PATTERSON, LONDON STROMBERG, MIKE RAPICH, DAN MALDONADO, DANIEL BECKER, RHETT MCQUISTON, TOM DARAIS, JEFFERY WILSON, MIKE HADDON, KIM ALLARD, DANIEL CHESNUT, LEO LUCEY, RICH TOWNSEND, GERI MILLER, and the STATE OF UTAH,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER ON RELATOR'S MOTION TO DETERMINE RELATOR'S SHARE OF SETTLEMENT PROCEEDS**<br><br>Case No. 2:15-cv-00054-RJS<br><br>Chief District Judge Robert J. Shelby |

    This qui tam action began when Reginald Williams, the Relator, filed a pro se complaint alleging the State of Utah and numerous State employees violated the False Claims Act, 31 U.S.C. § 3729.[1] The United States later intervened,[2] filed its own Complaint,[3] and settled its claims for $1.55 million.[4]

    Before the court is Williams's Motion to Determine his Share of Settlement Proceeds

---

[1] Dkt. 3, *Relator's Original Complaint* (filed Jan. 27, 2015) [SEALED].

[2] Dkt. 58, *Notice of Election to Intervene*.

[3] Dkt. 66, *First Complaint in Intervention*.

[4] Dkt. 191-1, *Settlement Agreement*.

1

pursuant to 31 U.S.C. § 3730(d)(1).[5] Having reviewed the parties' arguments, the relevant facts, and the governing case law, the court concludes Williams is entitled to 18% of the settlement, for a total award of $279,000.

## BACKGROUND AND PROCEDURAL HISTORY

Williams, a state prisoner, worked in the Utah Department of Corrections (UDC) Print Shop from 2009 to 2013.[6] In that role, he reviewed documents submitted to the print shop from several state agencies and discovered state actors were fraudulently obtaining and using federal grants.[7] Upon learning this, Williams brought this lawsuit in 2015 on behalf of the United States to recover the Government's damages, as authorized by the False Claims Act.[8]

The United States investigated Williams's allegations for five years, engaging in significant discovery efforts to obtain additional documentation, depose participants, and review records.[9] On April 10, 2020, the United States filed a Complaint in Intervention.[10] The Complaint in Intervention raised different claims and did not include all defendants named in Williams's original Complaint.[11] It also added the State of Utah as a Defendant.[12] After filing

---

[5] Dkt. 182, *Motion to Determine Relator's Share*.

[6] Dkt. 31, *Relator's First Amended Complaint* at 6–7.

[7] *Id.*

[8] *See Relator's Original Complaint*; 31 U.S.C. § 3730(b)(1) ("A person may bring a civil action for a violation of section 3729 for the person and for the United States Government.").

[9] *See Motion to Determine Relator's Share* at 9; *U.S. Opp.* at 8.

[10] Dkt. 66, *First Complaint in Intervention*.

[11] *Compare Complaint, with First Complaint in Intervention*.

[12] *See* Dkt. Entry April 10, 2020 (adding State of Utah per the *Complaint in Intervention*).

several Amended Complaints,[13] the United States and Defendants engaged in settlement negotiations before reaching an agreement (Agreement) on December 2, 2021.[14]

In the Agreement, the State denied any wrongdoing and resolved the settlement based on an unjust enrichment cause of action, a claim the United States raised in its Complaint in Intervention.[15] The State agreed to pay $1.55 million to the United States, thereby releasing the State from "any civil or administrative monetary claim the United States has for the covered conduct."[16] Both the United States and the State were party to the Agreement, but not Williams.[17] Once the Agreement was finalized, the United States and Defendants filed a Joint Motion to Dismiss with Prejudice.[18]

Shortly afterwards, Williams filed the present Motion, arguing he is entitled to 25% of the settlement proceeds.[19] Along with his Motion, Williams filed a Declaration outlining his contributions to the litigation.[20] Williams claims he first reached out to the United States Department of Justice (DOJ) in 2013 to disclose the fraudulent activity.[21] According to Williams, audits had not uncovered the violations he found.[22] In 2015, before filing his original

---

[13] Dkt. 79, *Amended Complaint in Intervention*; Dkt. 97, *Second Amended Complaint in Intervention*; Dkt. 143, *Third Amended Complaint in Intervention.*

[14] Dkt. 147, *Joint Motion for ADR*; Dkt. 154, *Minute Entry for Settlement Conference.*

[15] *Settlement Agreement* at 2; *Third Amended Complaint in Intervention* at 40–41.

[16] *Settlement Agreement* at 3.

[17] *Id.* at 1.

[18] Dkt. 173, *Joint Motion to Dismiss with Prejudice.*

[19] *See Motion to Determine Relator's Share.*

[20] Dkt. 182-1, *Declaration of Reginald Williams.*

[21] *Id.* ¶ 7.

[22] *Id.* at ¶ 12.

Complaint, Williams asserts he served a copy of the incriminating documents (allegedly nearly 4,000 documents in total) on the United States Attorney General and the United States Attorney for the District of Utah, identifying his allegations and supporting evidence.[23] After filing his Complaint, Williams twice met with United States Attorneys to share documents and explain the findings.[24] Finally, in 2018 Williams provided supplemental materials to the United States based on personal review of documents and reports produced by the United States in its investigation.[25] He claimed to have "spent several weeks reviewing and analyzing almost 3,000 documents."[26]

In his Declaration, Williams also details the consequences he believes he suffered from disclosing the fraud. He indicates that he submitted "a series of administrative grievances" to the UDC concerning the misuse of federal funds, specifically identifying UDC officials involved in the fraud.[27] According to Williams, he was threatened, sanctioned, and ultimately fired from his position at the print shop for filing these grievances.[28] The position allegedly paid $3,000 per year and Williams claims he has been unable to secure other employment at the prison since, due to being blackballed.[29] Williams alleges he was assaulted by a prison guard as a result of this lawsuit.[30] And after news stories of the lawsuit were published in 2020, Williams claims the

---

[23] *Id.* ¶ 5; *Motion to Determine Relator's Share* at 7, ¶ 4.
[24] *Declaration of Reginald Williams* ¶ 8; *Motion to Determine Relator's Share* at 10, ¶ 3.
[25] *Declaration of Reginald Williams* ¶¶ 10–11.
[26] *Id.* ¶ 11.
[27] *Id.* ¶ 13.
[28] *Id.* ¶¶ 14–16.
[29] *Id.* ¶ 16.
[30] *Id.* ¶ 17.

stories were "wide[ly] disseminat[ed]" within the prison and that guards told other prisoners to handle the "snitch."[31]

The United States opposed Williams's Motion, arguing he was only entitled to a 15% share of the settlement.[32] The United States was unaware Williams had reached out in 2013 with documentation.[33] While United States attorneys did meet with Williams in 2016 to discuss the case, they assert they never asked him to review any documents to help the investigation nor did they request the 2018 meeting.[34]

The Motion is now fully briefed. On request from the parties,[35] the court resolves the Motion based on the written memoranda.

## LEGAL STANDARD

The False Claims Act awards qui tam plaintiffs a share of settlement proceeds if the United States proceeds with its action.[36] A qui tam plaintiff "shall . . . receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending

---

[31] *Id.* ¶ 18.

[32] *U.S. Opp.* at 2. In the alternative, the United States argues Williams waived his objection to a settlement share because his Motion was filed after the court dismissed the case. *U.S. Opp.* at 13–14. Williams's Motion was filed three weeks after the case was dismissed. *See* Dkt. 174, *Order of Dismissal* (filed Aug. 8, 2022); *Motion to Determine Relator's Share* (filed Aug. 29, 2022). At the final status conference prior to dismissing the case, Williams stated on the record he had no objections to the settlement but noted he would be continuing to discuss his relator fee with the United States. The court gave Williams the opportunity to file a status report with the court within a week to outline his concerns, but the court inadvertently dismissed the case before the close of the week. *See generally* Docket. Williams did file a status report before the end of the week and indicated he intended to request a 25% fee award. Dkt. 177, *Status Report of Relator*, at 3. Thus, there is no basis for the court to conclude Williams waived this objection.

[33] *U.S. Opp.* at 10.

[34] *Id.* at 10.

[35] Dkt. 187, *Plaintiff's Status Report* at 4; Dkt. 189, *Defendants' Status Report* at 3; Dkt. 190, *Status Report of the Relator* at 6.

[36] *See* 31 U.S.C. § 3730.

upon the extent to which the person substantially contributed to the prosecution of the action."[37] The minimum award is considered a "finder's fee," paid to a relator "even if that person does nothing more than file the action in federal court."[38] The maximum award "is reserved for relators who actively and uniquely assist the government in the prosecution of the case."[39] The burden is on the relator to prove a contribution warranting a higher award.[40] District courts are afforded great discretion in determining a relator's share of settlement proceeds.[41]

To inform that discretion, courts generally rely on two sets of criteria to evaluate a relator's contribution to the case: 1) factors identified by the Senate when enacting the False Claims Act, and 2) DOJ guidelines.[42] These criteria are not binding on courts, but because both sides rely on them in their briefing here, the court looks to these criteria to help determine Williams's share of the settlement proceeds.[43]

## ANALYSIS

The court will first consider the Senate factors before turning to the DOJ guidelines.

### I. Senate Factors

The Senate Factors come from the legislative history of the 1986 amendments to the False Claims Act, where the Senate identified the following factors to be considered in

---

[37] *Id.*

[38] *U.S. ex rel. Alderson v. Quorum Health Grp. Inc.*, 171 F. Supp. 2d 1323, 1331, 1332 n.29 (M.D. Fla. 2001).

[39] *Zediker v. OrthoGeorgia*, 857 Fed. App'x 600, 604 (11th Cir. 2021) (per curiam) (internal citations and quotations omitted).

[40] *See id.*

[41] *See id.*; *U.S. ex rel. Johnson v. Universal Health Servs., Inc.*, 889 F. Supp. 2d 791, 794 (W.D. Va. 2012).

[42] *Zediker*, 857 F. App'x at 604.

[43] *See U.S. ex rel. Shea v. Verizon Commc'ns, Inc.*, 844 F. Supp. 2d 78, 81–82 (D.D.C. 2012); *see also* Motion to Determine Relator's Share at 4–6; *U.S. Opp.* at 4–6.

determining a relator's share of the recovery for a successful claim under the Act: (1) "the significance of the information provided by the relator," (2) "the relator's contribution to the final outcome," and (3) whether the government previously knew of the fraud.[44] Here, Williams provided significant information that was previously unknown, which weighs in favor of a slightly increased share of the award.

### A. Relator's Contribution of Significant Information

Because of his position within the UDC Print Shop, Williams had access to key information which he relayed to the United States. He provided nearly four thousand documents, identified all the grant applications, individuals, and agencies involved, and laid out allegations with supporting documentation.[45] The United States does not directly dispute these facts, arguing instead that Williams "overstates the quality of his contribution" because the United States "was required to conduct a separate and substantial investigation before it was able to resolve the matter."[46] According to the United States, Williams provided only general information in support of the allegations and included irrelevant information, hindering the investigation. And the Complaint in Intervention did not mirror Williams's Complaint—the Defendants and causes of action were different.[47]

These facts warrant a slightly increased award. First, if a relator, has access to inside

---

[44] *Shea*, 844 F. Supp. at 81–82 (citing S.Rep. No. 99–345, at 28 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5293).

[45] *Motion to Determine Relator's Share* at 7–8.

[46] *U.S. Opp.* at 7.

[47] *Compare Relator's Original Complaint* [SEALED] (containing four causes of action, three False Claims Act violations and one First Amendment claim), *with First Complaint in Intervention* (bringing nine causes of action, three False Claims Act violations and six state fraud claims).

7

information and invests time to investigate the materials before relaying them to the United States, as occurred here, this weighs in favor of finding a significant contribution.[48] Second, providing documentary evidence can also amount to a significant contribution.[49] While it is unclear the extent to which these documents were helpful, it is undisputed that Williams provided a large amount of information to the United States. Third, where a relator's initial allegations and factual information forms the basis for the successful qui tam action, that amounts to a significant contribution.[50] Three of Williams's four claims were found in the Complaint in Intervention, in a modified and expanded form, but nevertheless the claims laid the groundwork for the United States' case. All these facts support an increased award. However, the substantial investigation by the United States undermines in part the significance of Williams's contribution, leading to only an incrementally larger share of the settlement.[51]

      B.  <u>Relator's Contribution to Final Outcome</u>

Once the United States intervened, Williams played an insignificant role in the resultant settlement. After the initial meeting between Williams and the United States in 2016, the United States requested no additional materials or meetings with Williams. In fact, the United States directed Williams to refrain from further investigations. The United States conducted a five-year investigation before engaging in settlement negotiations. Thus, this factor weighs against an

---

[48] *See U.S. ex rel. Johnson Pochardt v. Rapid City Reg'l Hosp.*, 252 F. Supp. 2d 892, 897–98 (D. S. D. 2003); *Universal Health Servs.*, 889 F. Supp. 2d at 795–796.

[49] *See Rapid City Reg'l Hosp.*, 252 F. Supp. 2d at 897 ("The first factor, a contribution of significant information, encompasses the development of factual information, documentary evidence, and legal arguments.").

[50] *See id.* at 898.

[51] *See United States v. Evercare Hospice, Inc.*, No. 11-cv-00642-PAB-NYW, 2017 WL 491168, at *4 (D. Colo. Feb. 7, 2017) ("[A]lthough additional fact development by the government is not unusual, the substantial investigation by the United States undermines relators' request for a high-range reward.").

increased percentage of the award.

### C. Prior Government Knowledge of Relator's Information

The United States does not dispute that it knew nothing of the fraud prior to Williams's disclosure. Moreover, it seems unlikely the United States would have discovered the fraud as audits failed to expose the problem.

Because the first and third Senate factors weigh in favor of an increased award while the second does not, collectively they warrant a moderate enhancement of Williams's award.

## II. DOJ Guidelines

The DOJ Guidelines are internal criteria used by DOJ attorneys to determine a relator's share of proceeds when negotiating settlements in a qui tam action.[52] The Guidelines identify two sets of factors, one weighing in favor of increasing a relator's share[53] and one weighing in favor of reducing a relator's share.[54] The second set is essentially the inverse of the first. Thus,

---

[52] *Shea*, 844 F. Supp.2d at 83–84.

[53] Factors supporting an increased share include: "(1) The relator reported the fraud promptly; (2) When he learned of the fraud, the relator tried to stop the fraud or reported it to a supervisor or the government; (3) The qui tam filing, or the ensuing investigation, caused the offender to halt the fraudulent practices; (4) The complaint warned the government of a significant safety issue; (5) The complaint exposed a nationwide practice; (6) The relator provided extensive, first-hand details of the fraud to the government; (7) The government had no knowledge of the fraud; (8) The relator provided substantial assistance during the investigation and/or pre-trial phases of the case; (9) At his deposition and/or trial, the relator was an excellent, credible witness; (10) The relator's counsel provided substantial assistance to the government; (11) The relator and his counsel supported and cooperated with the government during the entire proceeding; (12) The case went to trial; (13) The FCA recovery was relatively small; and (14) The filing of the complaint had a substantial adverse impact on the relator." *Universal Health Servs.*, 889 F. Supp. 2d at 796 n.6.

[54] Factors supporting a reduced share include: (1) The relator participated in the fraud; (2) The relator substantially delayed in reporting the fraud or filing the complaint; (3) The relator, or relator's counsel, violated FCA procedures: (a) complaint served on defendant or not filed under seal, (b) the relator publicized the case while it was under seal, (c) statement of material facts and evidence not provided; (4) The relator had little knowledge of the fraud or only suspicions; (5) The relator's knowledge was based primarily on public information; (6) The relator learned of the fraud in the course of his government employment; (7) The government already knew of the fraud; (8) The relator, or relator's counsel, did not provide any help after filing the complaint, hampered the government's efforts in developing the case, or unreasonably opposed the governments' position in litigation; (9) The case required a substantial effort by the government to develop the facts to win the lawsuit; (10) The case settled shortly after the complaint was filed or

the court evaluates the two sets together, addressing the relevant factors.

### A. Participation in the Fraud

Williams played no role in the fraud. There should not be a reduction in the award on this basis.

### B. Timely Reporting and Attempts to Stop the Fraud

According to Williams, he promptly reported the fraud and attempted to stop it. He wrote a letter to the DOJ informing it of the fraudulent activity and filed administrative grievances with the UDC. While the United States is unable to confirm the letter to the DOJ, it does not dispute Williams's account of the timeliness of his report or his attempts to stop the fraud. These factors weigh in favor of an increased award.

### C. The Claim Stopped the Fraud

The claims in this case stopped the fraud and led to legislative amendments intended to prevent similar fraudulent conduct in the future.[55] This supports a higher award for Williams.

### D. First-Hand Details of Fraud

The relevant information came through Williams's government employment, which normally weighs in favor of reducing the award. But because of Williams's unique position as an inmate, he had no opportunity to take other employment and was not a government employee in the typical sense of the word. Through this employment, Williams was privy to sensitive,

---

with little need for discovery; and (11) The FCA recovery was relatively large. *Universal Health Servs.*, 889 F. Supp. 2d at 796.

[55] H.B. 403, 2022 Gen. Sess. (Utah 2022) (enacted) (creating a criminal justice database, setting reporting requirements for grant recipients, and directing strict compliance in using grant funds).

nonpublic documents that helped the United States identify the fraudulent activity.[56] In all, these factors balance out to have a mostly neutral effect on Williams's award.

### E. Government's Knowledge of Fraud

It is undisputed that the United States knew nothing of the fraud prior to Williams's disclosures. It is also unlikely the United States would have discovered the fraud in the near future as DOJ audits between 2004 and 2019 failed to uncover it. This is one of the "more important factors,"[57] and in this case it favors an increased award.

### F. Relator Assistance During Government Investigation/Government Effort

For five years, the United States expended significant resources to investigate the allegations. After the initial meeting between the United States and Williams, the United States requested no additional assistance from Williams. He provided supplemental reports and requested an additional meeting, but the United States carried the bulk of the investigation. A reduction is warranted based on this factor.

### G. Relator Testimony

Williams did not have to testify in the case, nor was he deposed. He nevertheless argues he is entitled to a larger share because he "offered candid and true information during his interview" with the United States.[58] He points to a case where a relator's share was increased, despite not testifying at trial, because the relator "was candid, honest, and helpful throughout all

---

[56] *See Rapid City Reg'l Hosp.*, 252 F. Supp. 2d at 899 ("Regardless of whether the information was unique, the government only knew that such information existed because of the relator. Indeed, the United States possessed no awareness from any source of the defendant's practices.").

[57] *Universal Health Servs.*, 889 F.2d at 797.

[58] *Motion to Determine Relator's Share* at 14.

of her interviews with the government and other agencies."[59] In that case, the government needed to interview the relator on several occasions over the course of years, as the relator was employed by the defendant throughout the litigation and had to single-handedly procure the evidence.[60] By contrast, here, the United States did its own investigation without the assistance of Williams and only requested one interview with Williams at the start of the investigation. These actions constitute only slightly more than the minimum and do not weigh in favor of an increased award.

### H. Assistance from Relator's Counsel

Next, Williams claims his counsel provided "substantial assistance" to the United States, but he only obliquely references his briefing without identifying any specifics.[61] Because Williams's assistance is mostly confined to his pre-litigation investigation and production and his qui tam filing, the court assumes Williams is referencing counsel's assistance with court filings.

The role played by Relator's counsel is the usual assistance rather than the extraordinary assistance meriting an increased award. An award above the minimal amount is warranted where a relator and his counsel participate "fully in virtually every aspect of the case from beginning to conclusion," and counsel's role is "equivalent to that of the DOJ attorneys."[62] In those cases, the relator's counsel often plays a role in the mediation as well.[63] Here, counsel

---

[59] *Rapid City Reg'l Hosp.*, 252 F. Supp. 2d at 901.

[60] *Id.* at 904.

[61] *Motion to Determine Relator's Share* at 14.

[62] *See Alderson*, 171 F. Supp. 2d at 1331, 1336; *see also Rapid City Reg'l Hosp.*, 252 F. Supp. 2d at 905 (supporting an increased award in part because the relator's attorneys "were nearly as prominent as the government's throughout the action" and played an "instrumental role in settling the case").

[63] *Alderson*, 171 F. Supp. 2d at 1336 ("With respect to the decisive yet arduous mediation, Alderson's counsel assumed the preeminent role.").

helped draft the initial thirty-page qui tam Complaint wherein Williams identified the individuals involved in the scheme, the agencies employing them, and identified the relevant federal statues and legal theories.[64] Relator also filed an Amended Complaint. However, the United States contends this filing "confused the issues and served to lengthen the United States' investigation."[65] Counsel does not claim to have participated in "virtually every aspect of the case" or assumed the lead role in settlement negotiations. For these reasons, this factor does not support a higher share of the settlement proceeds.

### I. Relator Support and Assistance in Litigation

Likewise, beyond providing initial documentation, filing the qui tam Complaint, and the later Amended Complaint, Williams did not play a substantial role in the litigation.[66] The United States expended significant discovery efforts and expanded the Complaint in Intervention. This factor does not provide for an increased award.

### J. Trial/Settlement

This factor looks to whether a case required trial or was resolved through settlement. A trial usually merits a higher award because it tends to require more effort from a relator, although not always.[67] Even if a case settles, this factor may still weigh in favor of an increased award if settlement negotiations were arduous, or if the relator and relator's counsel played an important role in the settlement.[68] Williams asserts this factor supports an increased award because the

---

[64] *Id.* at 7–8; *See Relator's Original Complaint* (filed Jan. 27, 2015) [SEALED].

[65] *U.S. Opp.* at 10.

[66] *See Supra* I.C.

[67] *Universal Health Servs.*, 889 F. Supp. at 798.

[68] *See Rapid City Reg'l Hosp.*, 252 F. Supp.2d at 903–04.

case lasted over seven years and his hard work and information ultimately led to the settlement.[69] These facts do not show Williams's role in the settlement to be anything more than the ordinary effort involved in litigation. Because the case did not go to trial and Williams did not expend increased efforts to achieve settlement, this factor weighs against an increased award.

### K. Amount of Recovery

The parties agree the recovery here, $1.55 million, is relatively small and supports an increased award.

### L. Adverse Impact of Complaint on Relator

Finally, Williams asserts he dealt with significant negative impacts due to his involvement in these claims.[70] The United States recognizes there may have been some impacts which were "not insignificant," but they do not merit a share above 15%.[71] Specifically, the United States contends there is "no direct connection" between Williams's lost job prospects and discrimination at the prison to his actions in this case. The United States also contends Williams frequently litigates against the State, implying that the negative impacts may have several causes.[72] Additionally, the United States asserts publicity should have been minimal because the Complaint was under seal until 2021, but after that point the publicity came in part because Williams chose to file the Complaint in his name (rather than as "John Doe").[73]

The impacts cannot be easily dismissed. Williams's unique situation as a prisoner makes

---

[69] *Motion to Determine Relator's Share* at 14.

[70] *Id.* at 15.

[71] *U.S. Opp.* at 12.

[72] *See id.*

[73] *See id.*

it difficult for him to find other employment, as his options are limited. This also creates a greater risk when raising issues because a prisoner is a ward of the state and cannot leave the situation once the investigation or litigation is complete. Filing internal grievances likely does create a reputation and make a prisoner unpopular with staff. It takes great courage for an incarcerated individual to initiate proceedings against his custodian. This is an unusual situation requiring extraordinary efforts. Even if, as the United States claims, Williams is overly litigious, in this instance the litigation was valid. And regardless of whether the complaint was in his name, because he filed internal grievances to start, it would not have been difficult for prison staff to identify Williams. Admittedly, there is no established direct connection between this case and Williams's discrimination and job loss. Nevertheless, the facts imply it may have been a factor. In sum, this factor weighs in favor of an increased award.

Taken together, seven of the fourteen factors for an increase are found here: (1) prompt disclosure, (2) the fraud was reported to a supervisor within the government, (3) the claim stopped the fraud, (4) the government was unaware of the fraud prior to the claim, (5) Williams provided first-hand information about the fraud, (6) the recovery was small, and (7) the filing had an adverse impact on Williams. Three factors weigh toward a minimal award: (1) Williams learned of the fraud through government employment (although this factor is somewhat discredited), (2) Williams and his counsel provided minimal support after alerting the United States of the fraud, and (3) the case required substantial investigation efforts by the United States. As a whole, the DOJ factors support a slightly increased award.

## CONCLUSION

After fully considering the facts, the parties' argument, and the relevant criteria, I find

18% of the settlement amount to be an appropriate award for Williams.  This award recognizes Williams contributed more than the bare minimum to the case while limiting his recovery in light of the relatively minor role Williams played in the United States' investigation and the significant efforts made by the United States to reach a settlement.

    IT IS ORDERED that Relator's Motion to Determine Relator's Share of Settlement Proceeds[74] is GRANTED in PART.  Williams is entitled to an increased award of 18%, totaling $279,000.

    DATED this 1st day of May, 2023.

BY THE COURT:

ROBERT J. SHELBY
Chief United States District Judge

---

[74] Dkt. 182.